FILED

At _840_ O'clock _G_ M

**MAY 0 7 2017**

LYNN STILLWELL
PHILLIPS COUNTY CIRCUIT CLERK
By_____ D.C.

## IN THE CIRCUIT COURT OF PHILLIPS COUNTY, ARKANSAS
## CIVIL DIVISION

KARLEY WILLIAMS, INDIVIDUALLY
AND ON BEHALF OF ALL OTHERS
SIMILARLY SITUATED                                    PLAINTIFF

VS.                    CASE NO. _34CV-2017-151_

PAFFORD EMS, LLC; PAFFORD
MEDICAL BILLING SERVICES, INC.,
AND PAFFORD MEDICAL SERVICES, INC.              DEFENDANTS

### CLASS ACTION COMPLAINT

COMES the Plaintiff, Karley Williams, Individually and on Behalf of All Others Similarly Situated, and for her Class Action Complaint, states:

### I. PARTIES

1.     Plaintiff, Karley Williams, is a resident of Phillips County, Arkansas.

2.     Defendant, Pafford EMS, LLC, is a limited liability company formed under the laws of the state of Arkansas. Its principal place of business is located in Arkansas and it provides, *inter alia,* emergency transport services to the citizens of Arkansas. Pafford EMS, LLC's registered agent for service of process is Philip Miron, 2000 Louisiana, Little Rock, AR, 72201.

3.     Defendant, Pafford Medical Billing Service, Incorporated, is a corporation formed under the laws of the state of Arkansas. At all times, Pafford Medical Billing Services, Inc., engaged in a joint enterprise with Defendants Pafford EMS, LLC and Pafford Medical Services, Incorporated, in which these Pafford Defendants provided emergency transfer service within the state of Arkansas. Pafford Medical Billing Services, Inc.'s principle place of business is within the borders of the state of Arkansas. Further, its registered agent for service of process is Philip

Miron, 2000 Louisiana, Little Rock, AR, 72201.

    4.     Defendant, Pafford Medical Services, Inc., is a for-profit corporation formed under the laws of the state of Arkansas. Pafford Medical Services, Inc. was, at all times, domiciled in the state of Arkansas and regularly conducted business by providing medical services to the citizens of Arkansas. At all times relevant herein, Pafford Medical Services, Inc., engaged in a joint enterprise with Pafford EMS, LLC and Pafford Medical Billing Services, Inc. The registered agent for service of process for Pafford Medical Services, Inc. is Philip Miron, 2000 Louisiana, Little Rock, AR, 72201. Pafford Medical Services, Inc., Pafford EMS, LLC, and Pafford Medical Billing Services, Inc. are collectively referred to herein as "the Pafford Defendants."

## II. JURISDICTION AND VENUE

    5.     This Court has subject matter jurisdiction over this action due to the amount and type of relief sought and because the amount in controversy exceeds the minimum jurisdictional limits of this court. Further, the facts giving rise to this suit occurred within the confines of the state of Arkansas and all parties named herein are residents of the State of Arkansas.

    6.     This Court has personal jurisdiction over all parties pursuant to Ark. Code Ann. § 16-4-101 because the parties named herein have consistent contacts with the state of Arkansas. Defendants are entities created under the laws under the state of Arkansas and have availed themselves of the privilege of conducting business in this state. Additionally, as detailed below, Defendants have committed numerous illegal acts within the State of Arkansas which give rights to civil liability.

    7.     Venue is appropriate in this forum pursuant to Ark. Code Ann. § 16-5-213 because of the residence of the Plaintiff and because a substantial part of the events giving rise to

Plaintiff's cause of action occurred in this county.

### III. GENERAL ALLEGATIONS

#### A. Karley Williams's Motor Vehicle Collision

8.     The allegations contained in Paragraphs 1-7 above are incorporated herein as if restated verbatim.

9.     Karley Williams was involved in a motor vehicle collision in Phillips County, Arkansas on June 27, 2016.  Both Karley Williams and the driver of the at-fault vehicle, Curtis Bridges, were residents of Phillips County, Arkansas.

10.     Karley Williams suffered numerous traumatic injuries including, *inter alia,* a head injury in the collision. Karley Williams was originally transferred to Helena Regional Medical Center for evaluation by a ground ambulance operated by the Pafford Defendants.   After evaluation from the physicians and emergency personnel at Helena Regional, Ms. Williams was transported by a Pafford Air One Delta helicopter to Regional One Health, a level one trauma center in Memphis, Tennessee, for evaluation and treatment of her injuries. Pafford Air One Delta is owned by and/or engaged in a joint enterprise with all of the named Pafford Defendants.

11.     Karley Williams was, at all times relevant to this suit, an Arkansas Medicaid recipient. As set forth in detail, *infra*, Ms. Williams' Medicaid benefits were provided through a Qualified Health Plan (hereinafter "QHP") issued by QualChoice.

12.     As a condition of her transportation by helicopter, the Pafford Defendants were assigned all rights belonging to Ms. Williams as an Arkansas Medicaid beneficiary, including the right to obtain reimbursement for medical services pursuant to the terms of her QualChoice QHP.  During this process, the Pafford Defendants were notified of Ms. Williams's Medicaid

coverage as provided by QualChoice and authorized the Pafford Defendants to bill QualChoice and to receive direct reimbursement from QualChoice for medical services provided to Ms. Williams. *See* **Exhibit A.**

13.    The Pafford Defendants's "customary" charges for the treatment provided to Ms. Williams totaled $20,889.00.

14.    Following her release from treatment, Ms. Williams filed suit against the at-fault driver responsible for the motor vehicle collision in the Phillips County Circuit Court. The tort suit was settled for a confidential sum.

15.    Following the transfer, the Pafford Defendants attempted to collect the full amount of its bill ($20,889.00) directly from Karley Williams. In fact, The Pafford Defendants asserted a lien for the full amount of its bill, encumbering any third-party settlement proceeds recovered by Karley Williams from the at-fault driver or his insurance carrier.[1] *See* **Exhibit B.**

16.    Karley Williams provided proof of her Medicaid coverage in the form of an insurance card to The Pafford Defendants at the time of her transfer and executed an assignment of rights authorizing Defendants to submit the bill to Ms. Williams' Medicaid carrier, QualChoice, for payment.

17.    At all relevant times, Karley Williams was a Medicaid recipient through Arkansas' "private option." Pursuant to the private option, Arkansas Medicaid provided Medicaid benefits to Karley Williams through the purchase of a Qualified Health Plan through QualChoice. Medicaid cost-sharing laws meant that the Pafford Defendants, through their provider agreement with QualChoice, had a legal obligation to submit bills to QualChoice. The Pafford Defendants disregarded these obligations under both the Arkansas Medicaid Program

---

[1] Pafford's lien contained the amount of $1184.00, which was consistent with the amount of the ground transfer. However, the lien filing incorporated the bill for the air transfer by attaching all of the billing to the lien filing. The sum of the bills filed as part of the lien was $20,889.00.

and the Affordable Care Act. They refused to submit the charges for reimbursement and instead demanded payment of the inflated "customary charges" by filing a lien to encumber all monies Karley Williams was entitled to recover from the third-party, at-fault driver.

18.    The Pafford Defendants committed outright violations of Arkansas' Medicaid laws and the terms of the Affordable Care Act by denying Ms. Williams the right to her Medicaid benefits. Pursuant to Medicaid's well-established cost-sharing guidelines, it was illegal for the Pafford Defendants to intentionally refuse to submit the bill to QualChoice.

19.    As set forth below, at all times relevant, Karley Williams' Medicaid benefits were provided through QualChoice, pursuant to Arkansas' adoption of Medicaid expansion commonly referred to as the "private option." The Pafford Defendants' disregard of the applicable Medicaid laws was intentional. The Pafford Defendants chose to forego submitting the charges to the Medicaid provider for reimbursement to avoid their reimbursement being limited to the reduced rate it agreed to receive for services provided through its provider agreements with Medicaid and Qualchoice.

20.    By filing the illegal lien, the Pafford Defendants forced Karley Williams to pay an inflated amount for her emergency transport services.

21.    As discussed below, the Pafford Defendants' acts violate numerous Medicaid regulations and constitute intentional acts of unauthorized and illegal billing.

22.    Through these illegal billing practices, The Pafford Defendants systematically converted money from Ms. Williams and other similarly situated Arkansas Medicaid recipients.

23.    The Pafford Defendants' intentionally pursued a course of conduct designed to illegally convert money from indigent Arkansans for the sole purpose of increasing their profits.

## B. The Arkansas Medicaid Program

24.    Title XIX of the Social Security Act created a joint Federal-State medical assistance program commonly referred to as Medicaid.  Ark. Code Ann. § 20-77-107 authorizes the Arkansas Department of Human Services to establish a Medicaid program in Arkansas.  The Medicaid program provides necessary medical services to eligible persons who would not be able to pay for such services.

25.    The Arkansas General Assembly has enacted statutes to implement the Medicaid program in Arkansas.  It is the stated intent of the General Assembly that the Medicaid program is intended to be supplemental to other potential sources of payment which are or may be available to pay for the cost of medical care delivered to the beneficiaries.

26.    Thus, the Arkansas legislature enacted statutes to allow the State of Arkansas to seek reimbursement from third party sources after Medicaid benefits have been paid to medical care providers.

27.    The Arkansas statutes specifically prevent the healthcare provider from circumventing this reimbursement process and seeking a claim for its full bill directly from the third party.  Ark. Code Ann. § 20-77-104(a) states "it is the specific intent of this section... to prohibit any provider of medical services who participates in the Arkansas Medicaid program to bill or receive payment from any Medicaid-eligible person, his or her spouse, relative, guardian, or any other prospective payee for services or considerations for which payment is either payable in full or has been paid in full by the program."

28.    Further, Ark. Code Ann. § 20-77-104(c) states "it is the intent of this section... to prohibit any payment by any Medicaid-eligible person or his or her payee in excess of the rate or fee for service that the medical services provider has agreed to accept as payment in full as

evidenced by written agreement or contract to participate in the program."

29.    The statutory scheme enacted by the Arkansas legislature is consistent with the Federal statutes enacting the Medicaid program. Federal law provides that Medicaid providers must accept payment from Medicaid as payment in full. It further mandates that a service provider "may not seek to collect from the individual (or any financially-responsible relative or representative of that individual) payment of an amount for that service." 42 U.S.C. § 1396a(a)(25)(C).

30.    In addition, 42 C.F.R. § 447.15 (2012), entitled "Acceptance of State Payment as Payment in Full," requires that a State "must limit participation in the Medicaid program to providers who accept, as payment in full, the amounts paid by the agency plus any deductible, coinsurance, or copayment required by the Plan to be paid by the individual."

31.    To the extent Defendants rely upon any State law or common law inconsistent with the requirements of the Arkansas statutes and Federal statutes and regulations cited above enacting the Medicaid program, such law is preempted by Federal law. *See Abbott v. Banner Health Network*, 341 P.3d 478 (2014); *see also Spectrum Health*, 410 F.3d 304 (6th Cir. 2005); *Miller v. Gorski Waldyslaw Estate*, 547 F.3d 273 (5th Cir. 2008).

32.    The Pafford Defendants have entered into a contract to participate in the Arkansas Medicaid Assistance Program through contracts with both the State of Arkansas and QualChoice. *See* **Exhibit C**. The Pafford Defendants, by contractually agreeing to participate, agreed to comply with the applicable Arkansas statutes with respect to ensuring that Medicaid beneficiaries are not billed directly for Medicaid-covered services, and that the beneficiaries are not charged in excess of the rate agreed to by Medicaid for the medical services provided.

33.    Arkansas' Medicaid statutes, the Medicaid provider agreements, and Medicaid

Contracts for Participation contain clear directives requiring medical care providers to submit bills for covered services to Medicaid for reimbursement.

34.    Reimbursement is based upon the contractually agreed-upon rate which, in most circumstances, is substantially less than the full charge actually billed for the service provided by the healthcare provider.

35.    Once Medicaid has paid the provider for the service, Medicaid has a right of reimbursement against any third party liability insurance carriers or other "health insurers" as set forth in Ark. Code Ann. § 20-77-301, *et seq.* In fact, automobile liability insurance carriers are specifically defined as "health insurers" for purposes of this section. *See* Ark. Code Ann. § 20-77-306(a)(1)(A).

36.    Nothing in the applicable statutes, the provider manuals, or the Contract to Participate in the Medicaid program permit healthcare providers such as the Pafford Defendants (or its collection agents acting on its behalf) to circumvent this process and seek a claim for reimbursement directly from the patient.

37.    The Pafford Defendants entered into a provider agreement with Arkansas Medicaid in which they have specifically agreed "to accept payment from Medicaid as payment in full for a covered service, and to make no additional charges to the beneficiary or accept any additional payment from the beneficiary except cost share (co-pay or deductible amounts) established by the Medicaid program."

38.    A lien asserted by The Pafford Defendants herein, such as the one asserted against Karley Williams, is a claim created by application of Arkansas statute, Ark. Code Ann. § 18-46-101, *et. seq.* This statutory framework gives rise to a lien "for the value of the service rendered and to be rendered by the practitioner, nurse, hospital, or ambulance service provided <u>to a patient</u>

. . . for the relief and cure of an injury suffered through the fault or neglect of someone other than the patient . . . on any claim, right of action, and money to which the patient is entitled because of that injury . . . " Ark. Code Ann. § 186-46-104. Thus, the statute creates a lien against the patient and the patient's cause of action. The lien, therefore, is not an effort to pursue payment from a third party, but rather an effort to recover directly from the patient and Medicaid beneficiary by impairing the beneficiary's rights.

39.     Plaintiff and Class Members are intended third party beneficiaries of the Provider Agreement and are the intended and protected beneficiaries of the regulatory scheme authorizing this contract.

40.     Thus, to ensure this statutory scheme is followed, and to prevent healthcare providers from billing charges to Medicaid-eligible patients for charges in excess of that to which they would be entitled to receive from Medicaid, providers are required to submit all bills to Medicaid for payment, and then assign to Medicaid their right to payment or reimbursement from third party sources so that Medicaid can recover its payment.

41.     The practice of accepting the Medicaid reimbursement and then seeking to collect the remaining differencing between the "standard" charge and the Medicaid reimbursement is known as "balance billing" which is clearly prohibited by Federal and State law. The purpose of this practice is to recover amounts directly from the patient which exceed that to which the providers are entitled to recover from Arkansas Medicaid. Such actions are clear violations of the "cost-sharing" guidelines set forth by the State and Federal Medicaid guidelines.

42.     The lien asserted by The Pafford Defendants, such as the one asserted against Ms. Williams, is a bill to receive payment from a Medicaid-eligible person for services for which payment is payable by the Medicaid program.

43.    The Pafford Defendants engaged in specific policies and practices to disregard applicable Arkansas and Federal law with respect to billing Medicaid for Medicaid-eligible services provided to Medicaid beneficiaries.

44.    Instead, The Pafford Defendants, in circumstances involving victims of motor vehicle collisions for which payment from a third-party liability carrier is apparent, insist upon asserting statutory liens against the Medicaid beneficiary in order to recover the "standard amount" for charged services, which greatly exceed the negotiated rates the Pafford Defendants agreed to accept from Medicaid and/or QualChoice.  In addition to violating State and Federal laws, the conduct of The Pafford Defendants undermines Medicaid's purpose of assisting low income citizens.    Through their illegal billing practices, the Pafford Defendants caused intentional financial harm to people they knew were among Arkansas' poorest citizens.

45.    As set forth below, this policy and practice by The Pafford Defendants not only violates the Arkansas and Federal Medicaid statutes, but constitutes numerous violations of Arkansas law.

### C. Arkansas' Medicaid Expansion And Adoption of the "Private Option"

46.    In September 2013, Arkansas became the first state in the nation to receive approval from the Federal Government to enact a Medicaid expansion program aimed at eliminating the traditional "fee for service" Medicaid system previously implemented by Arkansas to provide Medicaid benefits.

47.    With approval from the Federal government, Arkansas chose to adopt the Arkansas Health Care Independence Program, commonly known as the "private option," as part of the Arkansas Medicaid program.  The private option program was aimed at eliminating the "fee for service" system by requiring most adults who are eligible for coverage through

Arkansas' Medicaid program to obtain Medicaid coverage in the form of a Qualified Health Plan provided through Arkansas' insurance marketplace.

48.    Thus, the private option significantly changed the administration of Medicaid benefits to Arkansans by using Medicaid funds to purchase Qualified Health Plans for Medicaid recipients through the marketplace created in conjunction with the Affordable Care Act.

49.    While the private option allowed Medicare recipients to obtain Qualified Health Plans through Arkansas' Healthcare Exchange, Medicaid recipients' cost-sharing obligations were still subject to compliance with the mandates established by Congress in enacting Medicaid and overseeing the federal proceeds used to fund state Medicaid programs.

50.    The private option simply provided a means whereby Arkansas was allowed to use state and federal Medicaid funds to purchase insurance for Medicaid recipients through the Arkansas' insurance exchange.

51.    On September 27, 2013, the Centers for Medicare and Medicaid Services (CMS) approved Arkansas' request to implement the private option, subject to the rules and limitations established in the comprehensive "Special Terms and Conditions (STCs)" submitted by CMS to the Arkansas Department of Health. **See Exhibit D.**

52.    Subject to the Special Terms and Conditions, Arkansas was granted the authority to proceed with implementation of the private option effective January 1, 2014, through an initial demonstration period extending until December 31, 2016.

53.    As set forth above, at the time of the events alleged herein, Karley Williams was a Medicaid recipient. She received her benefits in the form of a Qualified Health Plan issued by QualChoice, which was purchased with Medicaid funds pursuant to the private option.

54.    Since the adoption of the private option, nearly all Medicaid recipients in

Arkansas receive Medicaid benefits through the private option, wherein Medicaid funds are ised to purchase coverage for Medicaid beneficiaries through a Qualified Health Plan.

55.     QualChoice, along with the other insurance carriers that provide Qualified Health Plans in Arkansas, have received substantial financial benefit through Arkansas' decision to replace the traditional Medicaid system by through the use of Medicaid dollars to purchase private option plans for Medicaid recipients.

56.     According to the most recent estimates, over 93% of the Medicaid recipients in Arkansas are enrolled in the "private option" and receive Medicaid benefits in the form of a Qualified Health Plan purchased with state and federal Medicaid funds.

57.     Arkansas adoption of the "private option" has provided a substantial increase in the number of insurance plans sold by QualChoice and other Arkansas insurance providers. Thus, the "private option" has provided the insurers participating in Arkansas' marketplace significant amounts of additional revenue since its adoption in 2014.

58.     Since 2014, Arkansas health insurers have received substantial financial benefits through Arkansas' use of the "private option." From 2014 through 2016, Medicaid enrollment in Arkansas increased by 324,000 participants.   Approximately 300,000 of the newly-covered Medicaid recipients receive their coverage through the purchase of Qualified Health Plans from QualChoice or one of the other insurance companies approved to sell Qualified Health Plans in Arkansas.

59.     In addition to the Arkansans who were enrolled in Medicaid through the program's expansion following the enactment of the Affordable Care Act, the "private option" required the majority of Arkansans who were Medicaid recipients prior to its expansion to enroll in the private option and obtain coverage through a Qualified Health Plan funded by the

Medicaid program. Thus, the vast majority of the approximately 550,000 Arkansans who were enrolled in Medicaid prior to 2014 are currently enrolled in the "private option" and covered under a Qualified Health Plan issued by QualChoice or one of the other insurers who participate in Arkansas' marketplace.

60.    For 2017, Governor Hutchison recently requested and received approval from the Federal government allowing Arkansas to continue to provide Medicaid coverage to eligible Arkansas through the purchase of Qualified Health Plans for an additional four (4) years. In his request, Governor Hutchison noted that replacing the traditional "fee for service" Medicaid system through the purchase of insurance plans for indigent Arkansans has proved successful in expanding Medicaid coverage in Arkansas, noting that Medicaid enrollment grew by 69% from the end of 2013 to September 2016.

61.    The most recent estimates provide that an additional 250,000 Arkansans are currently eligible for Medicaid coverage through the "private option."[2] Thus, through adoption of the "private option" QualChoice and the other insurers participating in Arkansas' marketplace have received the financial benefit of the privatization of the vast majority of Arkansas' Medicaid system. In addition, the number of overall Medicaid recipients has increased dramatically. Medicaid is expected to continue expanding in Arkansas, with QualChoice continuing to benefit from the expansion through increased sales of private insurance policies purchased through the use of Medicaid funds.

### D. Coverage Requirements Under The "Private Option" And The Affordable Care Act

62.    Plaintiff restates the allegations set forth in paragraphs 1-61 as if set forth

---

[2] In requesting approval from the federal government to continue implementing the "private option" in Arkansas, Governor Hutchison officially named the "private option" as "Arkansas Works." Although the name changed, the terms of the program remain the same.

verbatim.

63.     Under the private option, Arkansas' Medicaid program was expanded to provide premium assistance to support the purchase by beneficiaries eligible under the state plan of coverage from QHP's offered in the individual market through the Marketplace.

64.     Arkansas defines eligible adult participants as persons to include (1) childless adults with incomes at or below 133 percent of the federal poverty limit or (2) parents and other caretakers with incomes between 17 percent and at or below 133 percent of the federal poverty level.

65.     The Special Terms and Conditions established by the Federal government specifically provided that all requirements of the Medicaid program, expressed in law, regulation, and policy statement, not expressly waived or identified as not applicable in the waiver and expenditure authority documents provided with the approval of the private option will continue to apply to Medicaid recipients whose benefits are provided through implementation of the private option.

66.     In order to satisfy this requirement, all "private-option" beneficiaries in Arkansas are required to receive coverage under a "Silver" Qualified Health Plan and a supplemental Alternative Benefit Plan (ABP).  The ABP provides Medicaid beneficiaries access to medical services required by the Medicaid program that are not included in QHP's pursuant to the Affordable Care Act.

67.     CMS requires that ABP services be delivered through the service delivery network of the insurer that sells each recipient's QHP and that the QHP provider be the primary payer for such services.

68.     CMS also required that Arkansas and the insurers participating in its Marketplace

implement specific procedures to ensure that the Private Option complies with Medicaid's cost sharing requirements.

69.    The Arkansas Department of Human Services and The Arkansas Insurance Department entered into a memorandum of understanding (MOA) with QualChoice and all other QHP providers whereby the providers acknowledged the Special Terms and Conditions imposed on the Private Option plans and agreed to comply with all such terms.

70.    Through execution of the MOA, QualChoice and other insurers participating in the Marketplace agreed to comply with all federal requirements for Medicaid cost-sharing as set forth in all applicable statutes, regulations and policies. CMS specifically required that every Private Option plan comply with the cost sharing limitations described in 42 CFR § 447.56(a). *See id.* CMS included a schedule of cost-sharing amounts as an exhibit to its Special Terms and Conditions, which establishes a beneficiary's maximum shared cost for the various categories of health-related expenses covered under the Private Option plans.

71.    CMS also established specific conditions for payment of premiums and additional costs QHP providers will incur through the additional payments associated with the cost sharing reductions with Private Option plans.

## IV. CLASS ACTION ALLEGATIONS

72.    Pursuant to Ark. R. Civ. P. 23, Plaintiff brings this lawsuit as a class action on behalf of herself and all others similarly situated. This action satisfies the Ark. R. Civ. P. 23(a) requirements of numerosity, commonality, typicality, and adequacy of representation, and the Rule 23(b) requirements of predominance and superiority.

73.    The proposed class which Plaintiff seeks to represent is defined as follows:

    a.    All persons who were Arkansas Medicaid-eligible beneficiaries and

received Medicaid-covered services from The Pafford Defendants whose bills were not submitted to Arkansas Medicaid for payment.

      b.    All persons who were Arkansas Medicaid-eligible beneficiaries and received Medicaid-covered services from The Pafford Defendants who received bills from The Pafford Defendants for the difference between The Pafford Defendants' standard charge and the Medicaid reimbursement.

      c.    All persons who were Arkansas Medicaid-eligible beneficiaries and received Medicaid-covered services from The Pafford Defendants who were forced to pay, had paid on their behalf, or are being asked to make payment for charges for medical care and services in an amount that violates The Pafford Defendants' admission Assignment Agreement and/or exceeds the co-payment, co-insurance, and/or deductible obligations for said persons and/or the terms of the Provider Agreement to treat such persons pursuant to the terms of such agreement.

      d.    All persons who were Arkansas Medicaid-eligible beneficiaries and received Medicaid-covered services from The Pafford Defendants who were not refunded amounts received by The Pafford Defendants in excess of amounts due for medical care and services provided by The Pafford Defendants to said persons

      e.    All persons who are Arkansas Medicaid-eligible beneficiaries and received Medicaid covered services from The Pafford Defendants for injuries sustained in an incident who did not receive the benefit of collection by The Pafford Defendants as an attorney-in-fact for medical services from a source most favorable to the patients among the sources known to The Pafford Defendants acting as attorney-in-fact.

      f.    All persons who are Medicaid-eligible beneficiaries and received

Medicaid covered services from The Pafford Defendants for injuries sustained in an incident for which a third-party was potentially liable whose subsequent claim against that third party was impaired by the assertion of a lien for a charge for services in an amount in excess of the agreed Medicaid reimbursement rate.

        g.    All persons who were Arkansas Medicaid-eligible beneficiaries and received Medicaid-covered services from The Pafford Defendants for injuries sustained in an incident for which first party insurance proceeds for personal injury protection benefits, med-pay benefits, underinsurance benefits, uninsurance benefits, or the like, whose claim for those benefits was impaired by the assertion of a lien for an amount in excess of the agreed Medicaid reimbursement rate.

        h.    All persons who were Arkansas Medicaid-eligible beneficiaries and received Medicaid-covered services from The Pafford Defendants who were sent collection notices by The Pafford Defendants that contained misleading statements of facts and misrepresentations regarding their accounts with The Pafford Defendants.

    74.    Excluded from the class are:

        a.    All persons who receive no monies from any third party against whom their liability claims are pursued, either through settlement, judgment, or otherwise.

        b.    All persons whose bills from The Pafford Defendants were ultimately paid in full by Arkansas Medicaid and accepted by The Pafford Defendants as payment in full;

        c.    All persons who were only billed by The Pafford Defendants for a deductible, coinsurance, or co-payment as permitted by the Medicaid Provider Agreement.

        d.    The Pafford Defendants and its affiliates, officers, directors, agents, and employees;

       e.      Members of the judiciary and their staff to whom this action is assigned;

and

       f.      Plaintiff's counsel.

Plaintiff reserves the right to amend the definition of her Class as discovery in the case reveals whether the case should be so amended, including the addition of appropriate sub-classes or the expansion of the class to Medicare patients and/or patients residing in other states whose residents the Pafford Defendants routinely treats.

75.     The members of this class are so numerous that joinder of all members is impracticable. Plaintiff reasonably believes that hundreds, if not thousands, of Arkansas citizens geographically dispersed across Arkansas have been damaged by Defendant's actions. The names and addresses of the members of the class are identifiable through records maintained by the Defendant, and Class Members may be notified of the pendency of this action by mail, published, and/or electronic notice.

76.     Common questions of law and fact exist as to all Class Members and predominate over any questions affecting only individual Class Members. The questions of law and fact common to the class, include, but are not limited to:

       a.      Whether Arkansas law permits the Defendant to "balance bill" against Medicaid-eligible beneficiaries, or to collect directly from those beneficiaries.

       b.      Whether the Defendant's efforts to collect bills for Medicaid beneficiaries constitutes an effort to bill and receive payment from Medicaid eligible persons as prohibited by Ark. Code Ann. § 20-77-104;

       c.      Whether the Defendant's efforts to collect its full bill from Medicaid beneficiaries constitutes an effort to recover payment from a Medicaid-eligible person in excess

of the rate for services that it has agreed to accept as payment in full from Arkansas Medicaid;

   d. Whether Defendant has been unjustly enriched by its policies and practices by retaining money that should not have been received from the Plaintiff and other Class Members as described herein;

   e. Whether Defendant has converted funds to which Medicaid beneficiaries are entitled to possess;

   f. Whether Defendant has breached its contract with Arkansas Medicaid thus depriving Arkansas Medicaid beneficiaries of intended contractual benefits;

   g. Whether Defendant breached its assignment agreement with Karley Williams by refusing to accept Medicaid's reimbursement as payment in full of her bill;

   h. Whether Arkansas law permits the Defendant to assert liens against Medicaid-eligible beneficiaries in addition to or in lieu of submitting bills for Medicaid-covered services to Arkansas Medicaid;

   i. Whether Defendant's efforts to enforce statutory liens against Medicaid beneficiaries' causes of action against third parties constitutes an effort to bill and receive payment for Medicaid-eligible persons as prohibited by Ark. Code. Ann. § 20-77-104;

   j. Whether Defendant's efforts to enforce statutory liens against the Medicaid beneficiaries' causes of action against third parties constitutes an effort to recover payment from a Medicaid-eligible person in excess of the rate for services that they have agreed to accept as payment in full from Arkansas Medicaid.

   k. Whether Plaintiff or other Class Members have been damaged by the Defendant's breaches, as alleged herein and, if so:

     1. What is the nature and extent of those damages; and

2.    What relief should be awarded to Plaintiff and other Class

Members.

77.    Plaintiff's claims are typical of the claims of all Class Members, as they are all similarly affected by Defendant's custom and practice of unlawful and unjust conduct, and the claims are based on such conduct. Further, Plaintiff's claims are typical of the claims of all Class Members because her claims arise from the same underlying facts and are based on the same factual and legal theories. Plaintiff is no different in any material respect from any other member of the class.

78.    Plaintiff and her counsel will fairly and adequately protect the interests of the members of the class. Plaintiff's interests do not conflict with the interest of the class she seeks to represent. Plaintiff has retained counsel who are competent and experienced in class action litigation, as well as including insurance and healthcare-related cases. Plaintiff and her counsel will prosecute this action vigorously.

79.    The class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Joining all Class Members in one action is impracticable and prosecuting individual actions is not feasible. The size of the individual claims is likely not large enough to justify filing a separate action for each claim. For many, if not most Class Members, the class action is the only procedural mechanism that will afford them an opportunity for legal redress and justice. Even if Class Members had the resources to pursue individual litigation, that method would be unduly burdensome to the Courts in which such cases would proceed. Individual litigation exacerbates the delay and increases the expense for all parties, as well as the Court system. Moreover, individual litigation could result in inconsistent adjudications of common issues of law and fact.

80.     In contrast, a class action will minimize case management difficulties and provide multiple benefits to the litigation parties, including efficiency, economy of scale, unitary adjudication with consistent results and equal protection of the rights of the Plaintiff and Class Members. These benefits would result from the comprehensive and efficient supervision of the litigation by a single Court.

81.     Class certification is further warranted because Defendant has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief for corresponding declaratory relief is appropriate respecting the class as a whole.

### CLASS CLAIMS AGAINST THE PAFFORD DEFENDANTS

### COUNT I – BREACH OF CONTRACT

82.     Paragraphs 1-81 are incorporated herein by reference as set forth word for word.

83.     Upon acceptance of the patient by the Pafford Defendants, and as a condition of her treatment with the Pafford Defendants, Karley Williams assigned the Pafford Defendants all rights belonging to her as an Arkansas Medicaid beneficiary. This included an assignment of benefits authorizing the Pafford Defendants to bill Medicaid directly and to receive direct reimbursement from Medicaid for medical services provided to Ms. Williams. *See* **Exhibit A** ("Assignment Agreement").

84.     The Assignment Agreement attached hereto as Exhibit 1 assigns to the Pafford Defendants all of Karley Williams' rights to payment for medical bills as a Medicaid beneficiary.

85.     As a Medicaid beneficiary, Arkansas and Federal law prohibit medical care providers such as the Pafford Defendants from billing Medicaid beneficiaries directly for bills which are covered services under the Medicaid Provider Agreement. *See* 42 U.S.C. § 1396a(25)(C); 42 C.F.R. § 447.15(2012); *accord* Ark. Code Ann. § 22-77-104. This statutory

condition was accepted by the Pafford Defendants when it accepted Karley Williams' assignment of rights under the Assignment Agreement.

86.    Likewise, Arkansas and Federal law prohibit medical care providers such as The Pafford Defendants from billing Medicaid beneficiaries in excess of the agreed Medicaid reimbursement rate. *See id.* This statutory condition was accepted by The Pafford Defendants when it accepted Karley Williams' assignment of rights under the Assignment Agreement.

87.    Rather than adhering to its contractual responsibility to bill Medicaid for the treatment provided to Karley Williams, The Pafford Defendants directly billed and collected from its patients amounts which exceeded the agreed upon Medicaid reimbursement rates. The Pafford Defendants, therefore, breached its contract with Karley Williams by opting to collect from Karley Williams directly a sum of money that substantially exceeded the Medicaid rate for the services received.

88.    The Pafford Defendants and Karley Williams had a valid and enforceable contract under the Assignment Agreement.

89.    The contract assigned to The Pafford Defendants all rights belonging to Karley Williams as an Arkansas Medicaid beneficiary.  Karley Williams' status as a Medicaid beneficiary not only authorizes payment for all Medicaid-covered services by Arkansas Medicaid, but prohibits healthcare providers participating in the Medicaid program from billing patients such as Karley Williams for these services.

90.    Karley Williams did what the contract required of her by assigning her Medicaid rights to The Pafford Defendants and by providing The Pafford Defendants all information needed to submit her bills to Medicaid.

91.    The Pafford Defendants did not do what the contract required of it by billing

Karley Williams directly for the inflated charges for these services which greatly exceeded the agreed upon Medicaid reimbursement rate. Defendant's actions constitute a breach of contract, resulting in financial harm to Karley Williams and other Class Members as outlined herein.

92.    The Pafford Defendants breached the contract created by the Assignment Agreement with Karley Williams and have caused the Plaintiff and other Class Members damages as a result.

93.    In addition, in the performance of contractual obligations, Arkansas law implies a promise between the parties that they will act in good faith and deal fairly in performing and enforcing their obligations under the contract. Stated another way, the law implies a promise between the parties that they will not do anything to prevent, hinder, or delay the performance of the contract.

94.    In breaching its contract with Karley Williams, The Pafford Defendants have taken affirmative actions to prevent, hinder, and delay the performance of its contract with Ms. Williams and the Class Members. Such actions are additional evidence of Defendants' breach of the contract.

95.    As a result of the Defendant's unlawful breach of contract, the Plaintiff and the Class Members have been damaged for an amount more fully set forth below and for which the Defendant is jointly and severally liable.

## COUNT II - VIOLATION OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT

96.    Paragraphs 1-96 are incorporated herein by reference as set forth word for word.

97.    Plaintiff and Class Members are "persons" entitled to protection under the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, *et. seq.*

94.    Defendant has engaged in unconscionable and false deceptive acts and practices

of business as described above. Despite being aware that Plaintiff is a Medicaid-eligible beneficiary, The Pafford Defendants has not only submitted bills for Ms. Williams' service to Medicaid and accepted Medicaid's payment, it attempted to bill the balance directly to Ms. Williams.

98.     Defendant, through its agents and employees, has engaged in unconscionable and false deceptive acts and practices of business as described above. Despite being aware that Plaintiff is a Medicaid-eligible beneficiary, the Defendant has not only submitted bills for Ms. Williams' service to Medicaid and accepted Medicaid's payment, it attempted to bill the balance directly to Ms. Williams. The Pafford Defendants also improperly asserted a lien and impaired Ms. Williams' third party claim despite knowing she was a Medicaid beneficiary.

99.     Defendant knowingly engaged in a scheme and artifice to defraud the Plaintiff and Class Members, made untrue statements of facts, omitted to state material facts necessary in order to make previous factual statements, in light of the circumstances in which they were made, not misleading, and engaged in acts and practices in courses of business which operated as a fraud and deceit upon the Plaintiff and Class Members. The actions are unconscionable, false, and deceptive in the practice of business and, thus, they are in violation of Ark. Code Ann. § 4-88-107.

100.     Defendant's conduct proximately caused Plaintiff and Class Members to suffer damages as set forth herein, as well as reasonable attorney's fees and costs of litigation pursuant to Ark. Code Ann. § 4-88-113(f).

101.     The improper actions of the Defendant has caused the Plaintiff and Class Members to suffer damages in excess of that required for federal diversity jurisdiction.

### COUNT III - UNJUST ENRICHMENT

102.    Paragraphs 1-101 are incorporated herein by reference as set forth word for word.

103.    The Pafford Defendant's conduct, as described above and as more specifically alleged in this count, also constitutes unjust enrichment, for which Plaintiff and other Class Members are entitled to pursue equitable remedies in accordance with Arkansas law.

104.    By "balance billing" and asserting unlawful liens against Medicaid beneficiaries as more fully described above, The Pafford Defendants have received payment in excess of that to which it was legally entitled as a result of its Medicaid provider agreements.

105.    Defendant's actions were unjust and inequitable in that it received far more than that which it was entitled to receive for its services as required by its contract with Arkansas Medicaid, the Medicaid Provider Manuals, and Arkansas statutes and regulations.

106.    Defendant's actions were unjust and inequitable in that it failed to disclose to Plaintiff and other Class Members that it was required to accept as payment in full payment from Medicaid for the discounted rate for the services provided to these Medicaid beneficiaries for these covered services.

107.    Defendant's actions were unjust and inequitable in that Defendant concealed from Plaintiff and other Class Members that it was receiving more than it was legally permitted to receive.

108.    Defendant's actions were unjust and inequitable in that Defendant concealed from Plaintiff and other Class Members that it was not permitted to bill Medicaid beneficiaries direct for The Pafford Defendants' services or to "balance bill" Medicaid beneficiaries.

109.    Defendant's actions were unjust and inequitable and the Defendant owed a fiduciary duty to, and/or had a special relationship with, Plaintiff and other Class Members.

110.    As a result of Defendant's unjust and inequitable actions, The Pafford Defendants were unjustly enriched by receiving something of value to which it was not entitled.  More specifically, Defendants retained, and had the beneficial use of, money that Plaintiff and other Class Members were entitled and should have received.

111.    As a result of its unjust and inequitable actions, The Pafford Defendants were unjustly enriched by receiving money under such circumstances that, in equity and good conscious, it ought not retained.

112.    In light of the foregoing, Plaintiff and other Class Members are entitled to restitution and other equitable relief.

## COUNT IV - CONVERSION

113.    Paragraphs 1-112 are incorporated herein by reference as set forth word for word.

114.    The Defendants intentionally took and exercised dominion and control over funds to which Plaintiff and Class Members were entitled by asserting claims against their third party liability claims which prevented them from receiving settlement funds to which they were otherwise entitled.

115.    The Defendant intentionally took and exercised dominion and control over funds to which the Plaintiff and Class Members were entitled to retain by billing and collecting from them monies to which The Pafford Defendants was not lawfully entitled to recover in violation of the Plaintiff's and Class Members' rights.

116.    The Defendant's actions as described above constitute a conversion of the funds to which the Plaintiff and Class Members were entitled to possess.

117.    As a result of the Defendant's unlawful conversion of Plaintiff's funds, the Plaintiff and Class Members have been damaged in an amount more fully set forth below.

## COUNT V – BREACH OF FIDUCIARY DUTY

118.    Paragraphs 1-117 are incorporated herein by referenced as set forth word for word.

119.    As a result of the relationship between Plaintiff, the Class Members, and The Pafford Defendants, including The Pafford Defendants' role as Attorney-In-Fact as the assignee of Plaintiff's Medicaid beneficiary rights under the Assignment Agreement, a fiduciary relationship exists between the Plaintiff, the Class Members, and The Pafford Defendants.

120.    Among the fiduciary duties owed by Defendant to Plaintiff and members of the Class is the duty to act on Plaintiff's behalf and in Plaintiff's best interests in seeking payment from available sources from Medicaid which was available to Plaintiff and members of the Class.

121.    Defendant breached its fiduciary duties by, among other things, communicating false information to the Plaintiff and Class Members regarding the amount of charges owed for medical care and services provided by The Pafford Defendants, wrongfully, deceptively, and improperly charging Plaintiff and Class Members for medical care and treatment that greatly exceeded the agreed-upon Medicaid reimbursement rates, failing to refund amounts received in excess of the amounts allowed pursuant to the Medicaid Provider Agreement, pursuing collection policies and practices which put the Defendant's financial interests ahead of the Plaintiff's and those of the Class Members', failing to pursue collection from sources favorable to Plaintiff and Class Members, and altering and modifying its billing and charges to enable collection from sources more favorable to The Pafford Defendants but less favorable to the Plaintiff and Class Members than otherwise were available.

122.    The Defendant breached its fiduciary duties owed to the Plaintiff and Class

Members in a manner that sought to benefit the Defendant and did, in fact, benefit Defendant.

121.    The Defendant's breach of fiduciary duties owed to the Plaintiff and Class Members proximately caused damages to the Plaintiff and Class Members as more fully set forth herein.

### COUNT VI – ABUSE OF PROCESS

122.    Paragraphs 1-121 are incorporated herein by referenced as set forth word for word.

123.    By asserting a lien for services provided to Medicaid beneficiaries for payment and instead asserting a lien which encumbered the Plaintiff and Class Members' claims, The Pafford Defendants' actions ultimately resulted in asserting liens for bills sent directly to Medicaid beneficiaries for services provided to them in an amount in excess of that which was agreed upon between The Pafford Defendants and Medicaid for these Medicaid-covered services.  The Pafford Defendants have, therefore, set in motion legal procedures against the Plaintiff and Class Members.

124.    By accepting payment from Medicaid and continuing to assert a lien for the balance difference between the standard charge and the Medicaid reimbursement rate, The Pafford Defendants' lien ultimately acted as a bill sent directly to these beneficiaries for services provided to them in an amount in excess of that which was agreed upon between The Pafford Defendants and Medicaid for these covered services.  The Pafford Defendants have, therefore, set in motion legal procedures against the Plaintiff and Class Members.

125.    The lien asserted by The Pafford Defendants constitutes "judicial process" as that term is defined under Arkansas law.

126.    In filing and asserting liens for unsubstantiated and meritless amounts against the

Plaintiff and Class Members in their claims, The Pafford Defendants intended to pervert the legal procedure to accomplish its true alternative purpose of extorting and coercing the Plaintiff and Class Members to pay money to it even though it had no right to seek such payment.

127.    The filing and assertion of unsubstantiated and meritless liens against the Plaintiff and Class Members in order to extort and coerce these payments constitutes a willful act perpetrated in the use of process which is not proper in the regular conduct of legal proceedings.

128.    Plaintiff demands a trial by jury on all issues.

WHEREFORE, Plaintiff Karley Williams, Individually and On Behalf of Other Similar Situated, request that the Court grant the following relief:

a.    Certify that this lawsuit may be prosecuted as a class action pursuant to Rule 23 of the Arkansas Rules of Civil Procedure;

b.    Appoint Plaintiff and Plaintiff's counsel to represent the class;

c.    Declare that the Defendant has breached its contract with Karley Williams and Arkansas Medicaid;

d.    Declare that the Defendant has violated the Arkansas Deceptive Trade Practices Act;

e.    Declare that the Defendant has been unjustly enriched as a result of its wrongful conduct;

f.    Declare that the Defendant has improperly converted funds belonging to the Plaintiff and the Class;

g.    Declare that Defendant has breached its fiduciary duty to Plaintiff;

h.    Declare that Defendant has illegally abused process in Arkansas;

i.    Award the Class damages in an amount equal to all amounts improperly billed to the Class and recovered through filing liens;

j.    Award the Class pre-judgment and post-judgment interest;

k.    Enjoin the Defendant from engaging in the unlawful and unjust conduct

complained of herein;

l.    Award the Class reasonable attorney's fees and costs; and

m.    Award the Class any and all other additional relief to which the Plaintiff and other Class Members may be entitled.

Respectfully Submitted,

Brandon W. Lacy #03098
LACY LAW FIRM
630 S. Main Street
Jonesboro, Arkansas 72401
870-277-1144

Jeffery O. Scriber, #2006526
JEFF SCRIBER, P.A.
324 S. Main Street
Jonesboro, AR 72401
870-336-0155

-and-

Donald Knapp
Knapp Lewis Law Firm
427 Cherry St.
Helena, AR 72342

Attorneys for Plaintiff

By:    Donald Knapp, Jr. (2006067)

# FINAL

# Patient Care Report

**Pafford Air One Delta**
PO BOX 1120
HOPE, AR 71802
(800) 451-8333

**Run Number:** 483121
**Date of Service:** 06/27/2016
**Patient Name:** KARLEY WILLIAMS

## CREW INFO

| | |
|---|---|
| Vehicle: | AID |
| Call Sign: | |
| Primary Role: | Air Transport Helicopter |
| Crew III ID: | HALEY, SCOTT |
| Crew Role: | Pilot |
| Crew Level: | Other Non-Healthcare Professional |
| Crew2 ID: | WALLACE, JULIE |
| Crew2 Role: | Secondary Patient Caregiver |
| Crew3 Level: | Registered Nurse |
| Crew3 ID: | FITCH, CHARLES |
| Crew Role: | Secondary Patient Caregiver |
| Crew3 Level: | EMT-Paramedic |
| Disp Loca: | |
| Disp Zone: | |
| Rec'd By: | FITCH, CHARLES |
| Assisted By: | |

## RESPONSE INFO

| | |
|---|---|
| Call Type: | |
| Resp Priority: | 10 - Priority 10 Rotary Scene |
| Resp Change: | No Change |
| Nature Of Call: | Traumatic Injury |
| EMD Perform: | Yes, Unknown If Pre-Arrival Instructions Given |
| EMD Card No: | |
| Disp Delay: | None/No Delay |
| Resp Delay: | Not Available |
| Call Taken by: | Direct Call |
| Resp With: | |
| Loca Type: | Hospital |
| Pt Found: | In Ambulance |
| Gen Zone No: | |
| Main Casualty: | |
| Poss Injury: | Yes |
| Response Zone: | |
| Location: | Helena Regional Medical Center Dept HELIPAD 1801 MARTIN LUTHER KING JR DR Helena, AR 72342 |

Case Not Available at Origin TRAUMA SURGEON

## DISPOSITION

| | |
|---|---|
| Type of Service: | 911 Response (Scene) |
| Outcome: | Treated/Trans. by ALS Unit |
| Dest Reason: | Closest Facility |
| Trans. Priority: | Code Air |
| Trans. Change: | No Change |
| Odometer Start: | 0.0 |
| At Scene Miles: | 0.0 |
| At Dest. Miles: | 57.0 |
| Odom. End: | 57.0 |
| Pts Found: | Stretcher |
| Cond at Dest: | Unchanged |
| Dest Type: | |
| Barriers to Care: | None Noted |
| Dest Delay: | None/No Delay |
| Scene Delay: | None/No Delay |
| Trans. Delay: | None |
| Destination: | The Med Regional Medical Site: Dept EMERGENCY DEPARTMENT-TRAUMA 877 JEFFERSON AVE Memphis, TN 38103 |
| Dest Zone No: | |
| Recv Loca: | CARMICHAEL, RN, JEN |

## TIMES

| | | |
|---|---|---|
| Injury: | 11:33 | 06-27-16 |
| PSAP: | 11:33 | 06-27-16 |
| Recvd: | 11:33 | 06-27-16 |
| Dispatch: | 11:33 | 06-27-16 |
| En route: | 11:41 | 06-27-16 |
| At scene: | 11:58 | 06-27-16 |
| At patient: | 11:58 | 06-27-16 |
| X fer of Care: | | |
| Leave Scene: | 12:08 | 06-27-16 |
| At dest: | 12:26 | 06-27-16 |
| In service: | 12:43 | 06-27-16 |
| Canceled: | | |
| At base: | | |

## PATIENT INFORMATION

| | |
|---|---|
| Name: KARLEY M WILLIAMS | Phone: |
| SSN: | DOB: |
| Sex: Female | Weight: 175 lbs (79.38 kgs) |
| Race: White | DL Info: |
| Ethnicity: Not Hispanic or Latino | Belongings Left With: |
| Birthdate: | Belongings: |
| Lcon Color: | |

Home Addr.:
WEST HELENA, AR 72390

Mailing Addr.: #34 PO 308.
WEST HELENA, AR 72390

Homeless: No

## NEXT OF KIN

| | | |
|---|---|---|
| Name: JUSTIN SPAKES | Phone: (870) 995-3974 | Relationship: Power of Attorney |

## INSURANCE

Primary Method: Insurance
Work Related: No
Payer Info:
Company: SHELTER AUTO INSURANCE    Policy #:    Group #:
Payer Info:
Company: QUALCHOICE INSURANCE CO LR    Policy #:    Group #:
Payer Info:
Company: PRIVATE PAY    Policy #:    Group #:

## PATIENT COMPLAINTS

Chief Complaint

| | | |
|---|---|---|
| Trauma – Contusion | Trauma – Head Injury | Trauma – MVA (Primary) |
| 30 Minutes | 30 Minutes | 30 Minutes |
| Neurological – Seizures/Convulsions | Trauma – Abrasion | |
| 30 Minutes | 30 Minutes | |

Anatomic Location
General/Global
Organ System
Global/General
Primary Symptom
Pain
Other Associated Symptom
Amnesia
Last Oral Intake

EXHIBIT
A
Tabbies

Page 1 of 5

# FINAL

## Patient Care Report

Pafford Air One Delta
P.O. BOX 1120
HOPE, AR 71802
(800) 441-8036

**Run Number:** 483121
**Date of Service:** 06/27/2016
**Patient Name:** KARLEY WILLIAMS

Medical Hx Obtained From
Patient

## HISTORY

**Past Medical History:**
Other
Note C:

**Allergies**
No Known Environmental/Food     Penicillin
Allergies

**Medications**
Other - Not Listed :

Medical History Obtained From
Patient

## ASSESSMENT

ETOH/Drug Use:  None Reported

06/27/2016  11:45:00 - NEW WALLACE, JULIE

| Body Area | Assessments and Comments | Body Area | Assessments and Comments |
|---|---|---|---|
| Airway | Patent | Breathing | Regular Rate and Quality |
| Circulation | Capillary Refill < 2 Seconds | Blood/Fluid Loss | None Noted |
| Head | Swelling | Face | No Complaint Reported |
| Left Ear | No Complaint Reported | Right Ear | No Complaint Reported |
| Left Eye | No Complaint Reported | Right Eye | No Complaint Reported |
| Nose | No Complaint Reported | Neck | No Complaint Reported |
| Trachea | No Complaint Reported | Pelvis | No Complaint Reported |
| Genitalia | No Complaint Reported | Abdomen - Generalized | No Complaint Reported |
| Abdomen - Left Lower | No Complaint Reported | Abdomen - Left Upper | No Complaint Reported |
| Abdomen - Right Lower | No Complaint Reported | Abdomen - Right Upper | No Complaint Reported |
| Arm - Lower Left | No Complaint Reported | Arm - Lower Right | Pain; Swelling |
| Arm - Upper Left | No Complaint Reported | Arm - Upper Right | No Complaint Reported |
| Both Eyes | No Complaint Reported | Cervical | No Complaint Reported |
| Chest - Left Upper | No Complaint Reported | Chest - Lower Left | No Complaint Reported |
| Chest - Lower Right | No Complaint Reported | Chest - Upper Left | No Complaint Reported |
| Chest - Upper Right | No Complaint Reported | External/Skin | Normal |
| Foot - Left | No Complaint Reported | Foot - Right | No Complaint Reported |
| Hand - Left | No Complaint Reported | Hand - Right | No Complaint Reported |
| Heart | Normal | Hip - Left | No Complaint Reported |
| Hip - Right | No Complaint Reported | Leg - Lower Left | No Complaint Reported |
| Leg - Lower Right | Abrasion ; Pain | Leg - Upper Left | No Complaint Reported |
| Leg - Upper Right | No Complaint Reported | Mental Status | A & O x 4 |
| Mouth | No Complaint Reported | Neurological | Solution |
| Periumbilical | No Complaint Reported | Substernal | No Complaint Reported |
| Thorax | No Complaint Reported | | |

## IMPRESSIONS

**Primary Impression:**     Traumatic Injury
**Secondary Impressions:**   Debris

## TRAUMA

| MVA Details : | How/Location : | Position :  Front Seat-Left Side (of motorcycle driver) | Height of Fall : |
| | Trauma Severity : | | Trauma Assessment Time : |
| | Social Alert : | | |

**Trauma**
MVA - Approximate Impact Speed - 20 - 40 MPH

MVA - Position of Patient in Vehicle - Front Left Seat (Driver Side)/Motorcycle Driver

MVA - Airbag - Unknown

**Cause of Injury**

MVA - Injury Indicators - Automatic crash notification indicating high injury risk

MVA - Main Area of Impact - Front Passenger Fender (1)

MVA - Protective Devices - Unknown

MVA - Main Area of Impact - Front - hood (12)

MVA Type - Head On

MVA - Injury Indicators - Windshield Spider/Star

MVA - Main Area of Impact - Front Driver Fender (11)

MVA - Scene - Unknown

# FINAL                                                            Patient Care Report



**Pafford Air One Delta**
PO BOX 1120
HOPE, AR 71802
(800) 851-6030

Run Number:  483121
Date of Service:  06/27/2016
Patient Name:  KARLEY WILLIAMS

MVC-Passenger Vehicle
**Mechanism of Injury**
Blunt
**Injury Intent type**
Unintentional

## VITAL SIGNS

| Time | PTA | BP | Pulse | Monitor Rate Regularity | SPO2 | EtCO2 | Glucose | GCS |
|---|---|---|---|---|---|---|---|---|
| 06/27/2016 12:08 | No | 114/70(85) Automated Cuff | 87, Strong, Regular | 22 Normal, Regular | 99%, Source: Room Air | | | E4 + V5 + M6 = 15 |

Skin Temp=Normal   Skin Color=Normal   Skin Moisture=Normal   Lung Sounds Left=Normal BS   Lung Sounds Right=Normal BS    Cap. Refill=Brisk
Pupil size: Left=3 mm, Right=3 mm   Pupil Reactiv: Left=Reactive, Right=Reactive   Pupil Dilation: Left=Normal, Right=Normal
Level of Consciousness: Alert; Pain Scale=2;
Cardiac Rhythm/Ectopics=Normal Sinus Rhythm,  No Ectopics Noted

Taken by:  WALLACE, JULIE

| 06/27/2016 12:15 | No | 113/73(86) Automated Cuff | 89, Strong, Regular | 20 Normal, Regular | 98%, Source: Room Air | | | E4 + V5 + M6 = 15 |

Skin Temp=Normal   Skin Color=Normal   Skin Moisture=Normal   Lung Sounds Left=   Lung Sounds Right=   Cap. Refill=Brisk

Level of Consciousness: Alert; Pain Scale=2;
Cardiac Rhythm/Ectopics=Normal Sinus Rhythm,  No Ectopics Noted

Taken by:  WALLACE, JULIE

| 06/27/2016 12:25 | No | 116/67(83) Automated Cuff | 91, Strong, Regular | 20 Normal, Regular | 99%, Source: Room Air | | | E4 + V5 + M6 = 15 |

Skin Temp=Normal   Skin Color=Normal   Skin Moisture=Normal   Lung Sounds Left=   Lung Sounds Right=   Cap. Refill=Brisk

Level of Consciousness: Alert; Pain Scale=2;
Cardiac Rhythm/Ectopics=Normal Sinus Rhythm,  No Ectopics Noted

Taken by:  WALLACE, JULIE

## PRIOR AID

| Prior Aid | Performed by | Outcome |
|---|---|---|
| Yes | EMS Provider | |

## TREATMENT SUMMARY

| Time | PTA | Treatment | Who performed | Authorized by | Comments |
|---|---|---|---|---|---|
| 11:40 | Yes | Venous Access-IV Maintenance | EMS Provider | Protocol (Standing Order) | |

Complication

# of Attempts: 01
IV Site: Forearm-Left
Size: 20 G
Volume Infused: 10 ML

Complication Narrative

Complication: None.
Rate: TKO
Solution: Saline Flush

IV Pump: No
Response: Unchanged
Successful: Yes

| Time | PTA | Treatment | Who performed | Authorized by | Comments |
|---|---|---|---|---|---|
| 11:55 | No | Assessment-Adult-ALS | WALLACE, JULIE | Protocol (Standing Order) | |

Complication

# of Attempts: 01
Successful: Yes

Complication Narrative

Complication: None

Response: Unchanged

| Time | PTA | Treatment | Who performed | Authorized by | Comments |
|---|---|---|---|---|---|
| 11:55 | No | Spinal Immobilization-C-Colla | WALLACE, JULIE | Protocol (Standing Order) | |

Complication

# of Attempts: 01
Successful: Yes

Complication Narrative

Complication: None

Response: Unchanged

# FINAL | Patient Care Report

**Pafford Air One Delta**
PO BOX 1120
HOPE, AR 71802
(800) 161-8036

**Run Number:** 453121
**Date of Service:** 06/27/2016
**Patient Name:** KARLEY WILLIAMS

## TREATMENT SUMMARY CONTINUED

| Time | PTA | Treatment | Who performed | Authorized by | Comments |
|------|-----|-----------|---------------|---------------|----------|
| 12:00 | No | Cardiac Monitor - ALS / Inter | WALLACE, JULIE | Protocol (Standing Order) | |

**Complication** | | | **Complication Narrative**

# of Attempts: 01
Method of Interpretation: Manual Interpretation
Successful: Yes

Complication: None
Response: Unchanged

ECG Type: 4 Lead
Rhythm: NSR

| Time | PTA | Treatment | Who performed | Authorized by | Comments |
|------|-----|-----------|---------------|---------------|----------|
| 12:00 | No | Pulse Oximetry | WALLACE, JULIE | Protocol (Standing Order) | |

**Complication** | | | **Complication Narrative**

# of Attempts: 01
Successful: Yes

Complication: None

Response: Unchanged

## NARRATIVE

- DISPATCHED CD FLIGHT SCENE TRAUMA LZ HRMC HELIPAD MEET PAFFORD 218

- MVA HEAD-ON COLLISION, HEAD INJURY/LOC/SEIZURE, ABRASIONS, CONTUSIONS

- PT REQUIRES TRANSPORT TO THE MED IN MEMPHIS A LEVEL ONE TRAUMA CENTER FOR FURTHER EVALUATION AND CARE BY TRAUMA SURGEON. PT REQUIRES RAPID AIR MEDICAL TRANSPORT DUE TO MOI AND POSSIBLE NEED FOR CRITICAL CARE INTERVENTIONS SHOULD PATIENT CONDITION DECLINE ENROUTE.

- ALLERGY TO PCN. PREVIOUS MEDICAL HX OF CHILDBIRTH. DAILY MED BRTH CONTROL.

- AOS AND ENTERED AMBULANCE TO FIND 20Y/O/F SUPINE ON STRETCHER, C-COLLAR IN PLACE, ALERT WITH GCS 15. MEDIC REPORTS PT WAS UNRESTRAINED DRIVER OF A CAR THAT STRUCK A TOW TRUCK THAT PULLED OUT IN FRONT OF HER. FRONT END DAMAGE AND WINDSHIELD STARRED. PT HAD A POSITIVE LOC WITH SEIZURE ACTIVITY WITNESSED BY RN BYSTANDERS ON SCENE. PT AMBULATORY UPON EMS ARRIVAL. PT PLACED IN C-COLLAR AND ON STRETCHER. IV START 20GA LT HAND SL. ASSESSMENT REVEALED SWELLING TO LT TEMPORAL AREA, PUPILS 3MM AND PEARL, CHEST SYMMETRICAL, LS C/E BILATERALLY, ABD SOFT AND NONTENDER, PELVIS STABLE, SWELLING AND CONTUSION TO RT FOREARM, ABRASIONS TO RT KNEE, BLEEDING CONTROLLED. BMC'S INTACT X 4 EXT. PT REPORTS PAIN MINOR 2 ON PAIN SCALE AND MOSTLY TO RT KNEE. PT REPORTS SHE URINATED ON HERSELF AT SOME POINT. UNABLE TO REMEMBER EVENTS AFTER THE CRASH.

- PT PLACED ON LSB IMMOBILIZATION, CARDIAC MONITOR AND PULSE OXIMETRY APPLIED, VS STABLE, NSR OBSERVED, PT PLACED IN HELICOPTER FOR TRANSPORT. HEARING PROTECTION PROVIDED.

- TRANSPORT INITIATED TO THE MED IN MEMPHIS. NO ADVERSE CHANGES IN PT CONDITION, VS REMAINED STABLE. ARRIVED AT THE MED AND THE PT WAS TAKEN TO ER CDA. CARE RELEASED TO RN STAFF WITH FULL REPORT. OUR CREW RETURNED TO SERVICE.

## MISCELLANEOUS

Trauma Registry ID: A717523
Research Survey | AR Trauma Severity | Moderate

## SIGNATURES

| Time | Type | Who signed | Why patient did not sign |
|------|------|------------|--------------------------|
| 06/27/2016 13:07 | Accept Treatment and Transport - Crew # | Crew Member #2 - WALLACE, JULIE M | Traumatic Injury |

BY SIGNING BELOW, I CERTIFY THAT THE PATIENT WAS PHYSICALLY OR MENTALLY INCAPABLE OF SIGNING AT THE TIME OF TRANSPORT, AND THAT NONE OF THE AUTHORIZED REPRESENTATIVES AS DEFINED IN 42 C.F.R. §424.36(b)(1)-(4) WERE AVAILABLE OR WILLING TO SIGN THE CLAIM ON BEHALF OF THE PATIENT.

X _Julie RN_

| 06/27/2016 13:08 | Facility Acceptance | Facility Employee - CARMICHAEL, RN, JEN | <Not applicable> |



# FINAL

## Patient Care Report

Pafford Air One Delta
PO BOX 1120
HOPE, AR 71802
(800) 491-3038

Run Number: 483121
Date of Service:   08/27/2016
Patient Name:   KARLEY WILLIAMS

I certify that KARLEY MORGAN WILLIAMS was received by our facility on the date and time set forth on this report and accept responsibility from crew members HALEY, SCOTT, WALLACE, JULIE.M, FITCH, CHARLES.M.

x  Verbal Consent

## CREW INFORMATION

Start Date/Time :  08/27/2016 08:00

| Crew # | Name | Crew # | Name | Crew # | Name |
|--------|------|--------|------|--------|------|
| AM1497 | HALEY, SCOTT | 33455 | WALLACE, JULIE | 10131 | FITCH, CHARLES |
| Level: | Other Non-Healthcare Professional | Level: | Registered Nurse | Level: | EMT-Paramedic |

x  S.H.A              x  D. Waller              x  C.M. SPC

08/22/2016   10:00   PHILLIPS CO, CIRCUIT CLERK              (FAX)8702385513              P. 002/003

ML2016-00475

## MEDICAL LIEN

IN THE CIRCUIT COURT OF PHILLIPS, ARKANSAS

PAFFORD MEDICAL SERVICES: PLANTIFF

VS,

DEFENDANT

NAME OF PATIENT: KARLEY M WILLIAMS

ACCOUNT #2221607796 CLAIM# 426817111

INSURANCE INFO:

ATTORNEY: KNAPP LAW FIRM
            107 HICKORY HILL DR
            HELENA, AR 72342

Notice is hereby given that the undersigned has and asserts a lien on any claim, right of action, and any money to which KARLEY M WILLIAMS is entitled. The lien arises from medical treatment and ambulance transport services rendered on 06/27/2016, The injuries Occurred on 06/27/2016 due to a motor vehicle accident. The services rendered are in the amount of $1184.00 is claimed by:

PAFFORD MEDICAL SERVICES
P.O. Box 1120
Hope, AR 71802
Phone: 800-451-8036
TAX ID: 721451789

STATE of ARKANSAS

FILED
At 10 o'clock A M

JUL 1 1 2016

LYNN STILWELL
PHILLIPS COUNTY CIRCUIT CLERK
By                    D.C.

**EXHIBIT**

B

ML2016-00476

COUNTY OF PHILLIPS

On this the 8TH day of JULY, 2016 before me,  the undersigned officer, personally appeared TINA YOUNG, who acknowledge herself to be the CLAIM SPECIALIST of PMS, a corporation, and that she, as such being authorized so to do, executed the foregoing instrument for the purposes therein contained by signing the name of the corporation by herself as TINA YOUNG.

In Witness whereof I here unto set my hand and official seal.

JENNIFER L LOWE
MY COMMISSION # 13272840
EXPIRES September 14, 2019
Nevada County



## Pafford Emergency Medical Services, Inc.
### Air One Division
P.O. Box 1120
Hope, AR 71802-1120
1-800-451-8036

122

| | | | |
|---|---|---|---|
| PATIENT NAME: | KARLEY M. WILLIAMS | PATIENT NUMBER: | 18479 |
| INSURANCE: | KNAPP LAW FIRM | CALL NUMBER: | 61118D0259 |
| | QUALCHOICE INSURANC | DATE OF CALL: | 06/27/2016 |
| | | TIME OF CALL: | 11:33 AM |
| | | CALLER: | |
| | | FROM: | 1801 MLK DR |
| | KARLEY WILLIAMS    61118D0259 | TO: | THE MED MEMPHIS |
| | | REASON(S) | |
| | WEST HELENA, AR 72390 | FOR | |
| | | TRANSPORT | |

| DESCRIPTION OF CHARGE | QUANTITY | UNIT PRICE | AMOUNT |
|---|---|---|---|
| AIR ROTARY BASE RATE         A0431 | 1.0 | 12500.00 | 12500.00 |
| AIR ROTARY MILEAGE           A0436 | 57.0 | 125.00 | 7125.00 |
| CARDIAC MONITOR              93041 | 1.0 | 50.00 | 50.00 |
| FILING FEE                   A0999 | 1.0 | 30.00 | 30.00 |
| | | Total Charges | 19705.00 |

| DESCRIPTION OF PAYMENT | RECEIPT | PAYMENT DATE | AMOUNT |
|---|---|---|---|
| | | | |
| | | | |
| | | Total Credits | 0.00 |

PLEASE PAY THIS AMOUNT ➤              $19705.00

---

DETACH ALONG PERFORATION ABOVE AND RETURN STUB WITH YOUR PAYMENT

| | | |
|---|---|---|
| PATIENT NAME:   WILLIAMS, KARLEY M | CALL NUMBER:   61118D0259 | AMOUNT DUE $   19705.00 |
| PATIENT NUMBER:   18479 | BILLING DATE:   07/11/2016 | AMOUNT $ ENCLOSED |

Please complete if paying by credit card   ☐ VISA   ☐ Amer. Express
Payment Amount $ _____   ☐ M/CARD   ☐ Discover
Cardholder's Signature _____   Exp. Date _____

CARD NUMBER _____   CID CODE _____

**SEE ATTACHED LIEN**
See Attached Medical Records

KNAPP LAW FIRM
107 HICKORY HILL DRIVE
HELENA, AR 72342

## HEALTH INSURANCE CLAIM FORM
APPROVED BY NATIONAL UNIFORM CLAIM COMMITTEE (NUCC) 02/12

PICA | | | | PICA

| 1. MEDICARE ☐ MEDICAID ☐ TRICARE ☐ CHAMPVA ☐ GROUP HEALTH PLAN ☐ FECA BLK LUNG ☐ OTHER ☒ | 1a. INSURED'S I.D. NUMBER (For Program in Item 1) |

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)
WILLIAMS, KARLEY, M

3. PATIENT'S BIRTH DATE / SEX: F ☒

4. INSURED'S NAME (Last Name, First Name, Middle Initial)
WILLIAMS, KARLEY M

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED: Self ☐ Spouse ☐ Child ☐ Other ☐

7. INSURED'S ADDRESS (No., Street)

CITY: WEST HELENA   STATE: AR

8. RESERVED FOR NUCC USE

CITY: WEST HELENA   STATE: AR

ZIP CODE: 72390   TELEPHONE (Include Area Code)

ZIP CODE: 72390   TELEPHONE (Include Area Code)

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)
WILLIAMS, KARLEY M

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (Current or Previous)   YES ☐ NO ☒

a. INSURED'S DATE OF BIRTH
06 15 1996   M ☐ F ☒

b. RESERVED FOR NUCC USE

b. AUTO ACCIDENT?   YES ☒ NO ☐   PLACE (State) AR

b. OTHER CLAIM ID (Designated by NUCC)

c. RESERVED FOR NUCC USE

c. OTHER ACCIDENT?   YES ☒ NO ☐

c. INSURANCE PLAN NAME OR PROGRAM NAME
KNAPP LAW FIRM

10d. INSURANCE PLAN NAME OR PROGRAM NAME
QUALCHOICE INSURANCE COMPANY

10d. CLAIM CODES (Designated by NUCC)

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?
YES ☐ NO ☐   If yes, complete items 9, 9a, and 9d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED SIGNATURE ON FILE   DATE 06 27 2016

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED SIGNATURE ON FILE

14. DATE OF CURRENT ILLNESS, INJURY, or PREGNANCY (LMP)
06 27 2016   QUAL. 431

15. OTHER DATE
QUAL. 439   06 27 2016

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION
FROM   TO

17. NAME OF REFERRING PROVIDER OR OTHER SOURCE
17a.
17b. NPI

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES
FROM   TO

19. ADDITIONAL CLAIM INFORMATION (Designated by NUCC) SCENE FLIGHT PT CRITICAL

20. OUTSIDE LAB?   YES ☐ NO ☐   $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY Relate A-L to service line below (24E)   ICD Ind.
A. S0590XA   B.   C.   D.
E.   F.   G.   H.

22. RESUBMISSION CODE   ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A. DATE(S) OF SERVICE From / To | B. PLACE OF SERVICE | C. EMG | D. PROCEDURES, SERVICES, OR SUPPLIES CPT/HCPCS / MODIFIER | E. DIAGNOSIS POINTER | F. $ CHARGES | G. DAYS OR UNITS | H. EPSDT | I. ID QUAL | J. RENDERING PROVIDER ID. # |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 06272016 06272016 | 42 | Y | AIR ROTARY BASE RATE  A0431  SE | A | 12500 00 | 1 | | NPI |
| 2 | 06272016 06272016 | 42 | Y | AIR ROTARY MILEAGE  A0436 | A | 7125 00 | 87.0 | | NPI |
| 3 | 06272016 06272016 | 42 | Y | CARDIAC MONITOR  93041 | A | 50 00 | 1 | | NPI |
| 4 | 06272016 06272016 | 42 | Y | TILING FEE  A0999  SH | A | 30 00 | 1 | | NPI |
| 5 | | | | | | | | | NPI |
| 6 | | | | | | | | | NPI |

25. FEDERAL TAX I.D. NUMBER   SSN ☐ EIN ☒
721251788

26. PATIENT'S ACCOUNT NO.
61116D02899L

27. ACCEPT ASSIGNMENT?   YES ☒ NO ☐

28. TOTAL CHARGE
$ 19705 00

29. AMOUNT PAID
$ 0 00

30. Rsvd for NUCC Use

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS
(I certify that the statements on the reverse apply to this bill and are made a part thereof.)
SIGNED Jennifer Davis   DATE

32. SERVICE FACILITY LOCATION INFORMATION
FROM: 1801 MLK DR
HELENA, AR 72342
TO: 877 JEFFERSON
MEMPHIS, TN 38103

33. BILLING PROVIDER INFO & PH #   (800) 451-8036
PAFFORD AIR ONE DELTA
PO BOX 1120
HOPE AR 71802-1120
a. 1235485281

NUCC Instruction Manual available at: www.nucc.org   PLEASE PRINT OR TYPE   APPROVED OMB-0938-1197 FORM 1500 (02-12)

1393a5715

**CONTRACT**
**TO PARTICIPATE IN THE ARKANSAS MEDICAL ASSISTANCE PROGRAM**
**ADMINISTERED BY THE DIVISION OF MEDICAL SERVICES**
**TITLE XIX (MEDICAID)**

The following agreement is entered into between  **PAFFORD MEDICAL SERVICES INC** , hereinafter
called Provider, and the Arkansas Department of Human Services, hereinafter called Department.

1.    Provider, in consideration of the covenants herein, agrees:

A.    To keep records in accordance with generally accepted standards for the type of business and the
healthcare services provided, related to services provided to individuals receiving assistance under the
State Plan and billing for such services.

B.    To make available and, upon request, furnish all records described above to the Department, the
Medicaid Fraud Control Unit of the Arkansas Office of the Attorney General, the U.S. Secretary of the
Department of Health and Human Services or a designated agent or representative or any entity entitled
to records. For all Medicaid beneficiaries, these records include, but are not limited to those records
which are defined in Section "A" of this contract. For clients who are not Medicaid beneficiaries, the
records that must be furnished are financial records of charges billed to non-Medicaid insurance to
ensure that charges billed to Medicaid do not exceed charges billed to non-Medicaid insurance.

1)    In connection with this contract each party hereto will render certain confidential information relating
to the other party. For purposes of this contract, any information furnished or made available to one party
relating to the financial condition, results of operation, business, customers, properties, assets, liabilities
or information relating to the financial condition relating to beneficiaries and providers, including but not
limited to protected health information as defined by the Privacy Rule promulgated pursuant to the Health
Insurance Portability and Accountability Act (HIPAA) of 1996, is collectively referred to as "Confidential
Information."

2)    The contract shall safeguard the use and disclosure of information concerning applicants for or
beneficiaries of Title XIX services in accordance with 42 CFR Part 431, Subpart F, and shall comply with
45 CFR Parts 160 and 164 and shall restrict access to and disclosure of such information in compliance
with federal and state laws and regulations.

C.    To accept assignment under Title XVIII (Medicare) in order to receive payment under Title XIX (Medicaid)
for any applicable deductible or coinsurance that may be due and payable under Title XIX (Medicaid).

D.    To bill Medicaid only after a service has been provided, or as otherwise specified in the appropriate
Arkansas Medicaid Provider Manual, Official Notice or Remittance Advice message.

E.    To accept payment from Medicaid as payment in full for a covered service, and to make no additional
charges to the beneficiary or accept any additional payment from the beneficiary except that share (co-
pay or deductible amounts) established by the Medicaid Program.

F.    To take assignment and file claims with third party sources (medical or liability insurance, etc.) and if third
party payment is made to the Provider, to reimburse Medicaid up to the amount Medicaid paid for the
services, to make no claim against third party sources for services for which a claim has been submitted
to Medicaid and to notify Medicaid of the identity of each third party source discovered after submission
of a claim or claims to Medicaid.

G.    To make no charge to a beneficiary for a claim or a portion of a claim when a determination that the
service was not medically necessary is made based on the professional opinion of a peer reviewer,
except that such charge may be made to the beneficiary when he/she has requested the service and has
prior knowledge that he/she will be responsible for the cost of such service; and to reimburse the Division
of Medical Services for all monies paid for claims for services that later were determined "not medically
necessary."

H.    To provide all services without discrimination on the grounds of race, color, national origin, or physical or
mental disability within the provisions of Title VI of the Federal Civil Rights Act, Section 504 of the
Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990.

I.    To accept all changes legally made in the Program, and recognize and abide by such changes upon
being notified by the Medicaid Program, in the form of an update to, or an Official Notice/Remittance
Advice Message pertaining to, the appropriate Arkansas Medicaid Provider Manual.

J.    That the Department has furnished the Provider with a copy of the Arkansas Medicaid Provider Manual
containing the rules, regulations and procedures pertaining to his/her profession.  The Provider agrees
that the terms and conditions contained therein shall be a part of this contract if the same were set out
verbatim herein.  The Provider states that he/she is currently licensed to practice in Arkansas or within the
State where services were rendered and agrees to promptly notify the Department if his/her license is
revoked or suspended.  The Provider acknowledges by signature on this contract that he/she has
received a copy of the appropriate Arkansas Medicaid Provider Manual.

K.    To conform to all Medicaid requirements covered in Federal or State laws, regulations or manuals.

DMS-653 (R 5/08)
Page 2 of 3

EXHIBIT
C

L. To certify by original signature within 48 hours of claims being submitted by an electronic media, a claim count and dollar amount billed, that the information on the claims submitted is true, accurate and complete. The Provider agrees to maintain this certification as a matter of record for all claims submitted electronically by any media.

M. To notify the Department before any change of ownership or operating status. Upon change of ownership or operating status the successor owner or operator shall, as a condition of assumption of this agreement, hold the Department harmless for any rate or payment increases, decreases, or adjustments without respect to whether the increase, decrease, or adjustment relates to services delivered before the change in ownership or operating status.

N. FOR HOSPITALS ONLY

To understand that the Quality Improvement Organization (Arkansas Foundation for Medical Care, Inc) is responsible for the review of Medicaid admissions to inpatient hospitals (specifically for length of stay purposes), medical necessity and as otherwise specified in the Memorandum of Understanding between the individual hospital and Arkansas Foundation for Medical Care, Inc.

II. The Department, in consideration of the material benefits and the covenants and undertakings of the Provider, agrees as follows:

A. To make payment to the above named Provider for the appropriate Medicaid covered services provided to eligible Medicaid beneficiaries in accordance with the applicable Medicaid reimbursement schedule in effect for the dates of service, and in accordance with the manual of rules, regulations and procedures that is a part of this contract.

B. To notify the above named Provider of applicable changes in Medicaid rules and regulations as they occur.

C. To safeguard the confidentiality of any medical records received by the Department or its fiscal intermediary, as specified in Federal and State regulations.

III. This contract may be terminated or renewed in accordance with the following provisions:

A. This contract may be voluntarily terminated by either party by giving thirty (30) days written notice to the other party without cause and/or convenience of either party.

B. This contract will be automatically renewed for one year on July 1 of each year if neither party gives notice requesting termination.

C. This contract may be terminated immediately by the Department for the following reasons:
1) Returned mail
2) Death of provider
3) Change of ownership
4) On either reason for which a sanction may be issued as set forth under the applicable Medicaid Provider Manual.

If the Provider is a legal entity other than a person, the person signing this Provider Contract on behalf of the Provider warrants that he/she has legal authority to bind the Provider. The signature of the Provider or the person with the legal authority to bind the Provider on this contract certifies the Provider understands that payment and satisfaction of these claims will be made from Federal and State funds, and that any false claims, statements or documents, or concealment of material fact, may be prosecuted under applicable Federal and State law.

Provider Name: PAFFORD MEDICAL SERVICES INC
(As inscribed on previous page of contract)

| Provider | Provider Enrollment |
|---|---|
| By: _[signature]_ | By: _[signature]_ |
| (Signature Required) | (Signature) |
| Name: Jamie Pafford-Gresham | Name: _[illegible]_ |
| (Typed or Printed Name Required) | (Typed Name) |
| Title: CEO | Title: Dr. _[illegible]_ |
| (Required) | |
| Date: 6-30-14 | Date: _[illegible]_ |
| (Required) | |
| | Effective Date of Contract: 11/30/1998 |

179-0715

**CONTRACT
TO PARTICIPATE IN THE ARKANSAS MEDICAL ASSISTANCE PROGRAM
ADMINISTERED BY THE DIVISION OF MEDICAL SERVICES
(TITLE XIX (MEDICAID))**

The following agreement is entered into between   PAFFORD MEDICAL SERVICE OF MS            hereinafter
called Provider, and the Arkansas Department of Human Services, hereafter called Department.

1.    Provider, in consideration of the covenants herein, agrees:

A.    To keep records in accordance with generally accepted standards for the type of business and the
healthcare services provided, related to services provided to individuals receiving assistance under the
State Plan and billing for such services.

B.    To make available and, upon request, furnish all records described above to the Department, the
Medicaid Fraud Control Unit of the Arkansas Office of the Attorney General, the U.S. Secretary of the
Department of Health and Human Services or a designated agent or representative of any entity entitled
to records. For all Medicaid beneficiaries, these records include, but are not limited to those records
which are defined in Section "A" of this contract. For clients who are not Medicaid beneficiaries, the
records that must be furnished are financial records of charges billed to non-Medicaid insurance to
ensure that charges billed to Medicaid do not exceed charges billed to non-Medicaid insurance.

1)    In connection with this contract each party hereto will receive certain confidential information relating
to the other party. For purposes of this contract, any information furnished or made available to one party
relating to the financial condition, results of operation, business, customers, properties, assets, liabilities,
or information relating to the financial condition relating to beneficiaries and providers, including but not
limited to protected health information as defined by the Privacy Rule promulgated pursuant to the Health
Insurance Portability and Accountability Act (HIPAA) of 1996, is collectively referred to as "Confidential
Information."

2)    The contract shall safeguard the use and disclosure of information concerning applicants for or
beneficiaries of Title XIX services in accordance with 42 CFR Part 431, Subpart F, and shall comply with
45 CFR Parts 160 and 164 and shall restrict access to and disclosure of such information in compliance
with federal and state laws and regulations.

C.    To accept assignment under Title XVIII (Medicare) in order to receive payment under Title XIX (Medicaid)
for any applicable deductible or coinsurance that may be due and payable under Title XIX (Medicaid).

D.    To bill Medicaid only after a service has been provided, or as otherwise specified in the appropriate
Arkansas Medicaid Provider Manual, Official Notice, or Remittance Advice message.

E.    To accept payment from Medicaid as payment in full for a covered service, and to make no additional
charges to the beneficiary or accept any additional payment from the beneficiary except that share (co-
pay or deductible amounts) established by the Medicaid Program.

F.    To take assignment and file claims with third party sources (medical or liability insurance, etc.), and if third
party payment is made to the Provider, to reimburse Medicaid up to the amount Medicaid paid for the
services; to make no claims against third party sources for services for which a claim has been submitted
to Medicaid; and to notify Medicaid of the identity of each third party source discovered, after submission
of a claim or claims to Medicaid.

G.    To make no charge to a beneficiary for a claim, or a portion of a claim, which a determination that the
service was not medically necessary, is made based on the professional opinion of a peer reviewer,
except that such charge may be made to the beneficiary when he/she has requested the service and has
prior knowledge that he/she will be responsible for the cost of such service; and to reimburse the Division
of Medical Services for all monies paid for claims for services that later were determined "not medically
necessary."

H.    To provide all services without discrimination on the grounds of race, color, national origin, or physical or
mental disability within the provisions of Title VI of the Federal Civil Rights Act, Section 504 of the
Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990.

I.    To accept all changes legally made to the Program, and recognize and abide by such changes upon
being notified by the Medicaid Program in the form of an update to, or an Official Notice/Remittance
Advice Message pertaining to, the appropriate Arkansas Medicaid Provider Manual.

J.    That the Department has furnished the Provider with a copy of the Arkansas Medicaid Provider Manual
containing the rules, regulations and procedures pertaining to his/her profession. The Provider agrees
that the terms and conditions contained therein shall be a part of this contract if the same were set out
verbatim herein. The Provider states that he/she is currently licensed to practice in Arkansas or within the
State where services were rendered and agrees to promptly notify the Department if his/her license is
revoked or suspended. The Provider acknowledges by signature on this contract that he/she has
received a copy of the appropriate Arkansas Medicaid Provider Manual.

K.    To conform to all Medicaid requirements covered in Federal or State laws, regulations or manuals.

L. To certify, by original signature within 48 hours of claims being submitted by an electronic media, a claim count and dollar amount billed, that the information on the claims submitted is true, accurate and complete. The Provider agrees to maintain this certification as a matter of record for all claims submitted electronically, or any media.

M. To notify the Department before any change of ownership or operating status. Upon change of ownership or operating status the successor owner or operator shall, as a condition of assumption of this agreement, hold the Department harmless for any rate or payment increases, decreases, or adjustments without respect to whether the increase, decrease, or adjustment relates to services delivered before the change in ownership or operating status.

N. FOR HOSPITALS ONLY

To understand that the Quality Improvement Organization (Arkansas Foundation for Medical Care, Inc.) is responsible for the review of Medicaid admissions to inpatient hospitals, specifically for length of stay purposes, medical necessity and as otherwise specified in the Memorandum of Understanding between the individual hospital and Arkansas Foundation for Medical Care, Inc.

II. The Department, in consideration of the material benefits and the covenants and undertakings of the Provider, agrees as follows:

A. To make payment to the above named Provider for the appropriate Medicaid covered services provided to eligible Medicaid beneficiaries in accordance with the applicable Medicaid reimbursement schedule in effect for the dates of service, and in accordance with the manual of rules, regulations and procedures that is a part of this contract.

B. To notify the above named Provider on applicable changes in Medicaid rules and regulations as they occur.

C. To safeguard the confidentiality of any medical records received by the Department or its fiscal intermediary, as specified in federal and State regulations.

III. This contract may be terminated or renewed in accordance with the following provisions:

A. This contract may be voluntarily terminated by either party by giving thirty (30) days written notice to the other party without cause and/or convenience of either party.

B. This contract will be automatically renewed for one year on July 1 of each year if neither party gives notice requesting termination.

C. This contract may be terminated immediately by the Department for the following reasons:
   1) Returned mail
   2) Death of provider
   3) Change of ownership
   4) Or other reason for which a sanction may be issued as set forth under the applicable Medicaid Provider Manual.

If the Provider is a legal entity other than a person, the person signing this Provider Contract on behalf of the Provider warrants that he/she has legal authority to bind the Provider. This signature of the Provider or the person with the legal authority to bind the Provider on this contract certifies the Provider understands that payment and satisfaction of these claims will be made from Federal and State funds, and that any false claims, statements, or documents, or concealment of material fact, may be prosecuted under applicable Federal and State laws.

Provider Name: PAFFORD MEDICAL SERVICE OF MS

(As inscribed on previous page of contract)

| Provider | Provider Enrollment |
|---|---|
| By: _(signature)_ | By: _(signature)_ |
| (Signature Required) | (Signature) |
| Name: Jamie L. Pafford-Gresham | Name: Feliz Uzoman |
| (Typed or Printed Name Required) | (Typed Name) |
| Title: CEO | Title: Pr. Analyst |
| (Required) | |
| Date: 6-30-14 | Date: 10/16/2014 |
| (Required) | Effective Date of Contract: 9/25/2013 |
| | for enrollment date |

DMS-653 (R 5/09)
Page 3 of 3



**Division of Medical Services**

Medicaid Director's Office

P.O. Box 1437, Slot S401 · Little Rock, AR 72203-1437
501-682-8292 · Fax: 501-682-1197



September 15, 2014

The Honorable Sylvia Mathews Burwell
Secretary of the U.S. Department of Health and Human Services
202 Independence Avenue, S.W.
Washington, D.C. 20201

Dear Madam Secretary:

As you know, Arkansas's Health Care Independence Program has been very successful in expanding health coverage. To date, more than 205,000 Arkansans have gained health coverage through this innovative demonstration program. According to a survey recently conducted by Gallup, Arkansas saw the biggest decline of all states in its uninsured rate, which has dropped from 22 percent to 12 percent.

Today, we respectfully submit an amendment to the Special Terms and Conditions for the Arkansas Health Care Independence Program section 1115(a) Medicaid demonstration.

These amendments propose three substantive changes to the Arkansas Health Care Independence Program, as required by Act 257 of 2014, the appropriation Act for the Division of Medical Services. Specifically, Act 257 includes special language that requires the Department of Human Services to submit and seek approval for the following revisions to the Health Care Independence Program to be effective no later than February 1, 2015: (1) approval of a limited state designed non-emergency transportation benefit for Health Care Independence Program enrollees; (2) approval of a model to create and utilize Independence Accounts; and (3) application of cost-sharing to Health Care Independence Program enrollees with incomes above 50% of the federal poverty level.

We appreciate your ongoing assistance and cooperation and look forward to your continued support of the Health Care Independence Program. Please do not hesitate to contact me if you have any questions or need additional information.

Sincerely,

Dawn Stehle
Director, Division of Medical Services
Arkansas Department of Human Services



EXHIBIT

D

CENTERS FOR MEDICARE AND MEDICAID SERVICES
SPECIAL TERMS AND CONDITIONS

**NUMBER:**   11-W-00287/6

**TITLE:**   Arkansas Health Care Independence Program (Private Option)

**AWARDEE: Arkansas Department of Human Services**

## I.  PREFACE

The following are the amended Special Terms and Conditions (STCs) for the Arkansas Health Care Independence Program (Private Option) section 1115(a) Medicaid demonstration (hereinafter demonstration) to enable Arkansas (State) to operate this demonstration. The Centers for Medicare & Medicaid Services (CMS) has granted waivers of requirements under section 1902(a) of the Social Security Act (Act), and expenditure authorities authorizing federal matching of demonstration costs that are not otherwise matchable, and which are separately enumerated. These STCs set forth in detail the nature, character, and extent of federal involvement in the demonstration and the State's obligations to CMS during the life of the demonstration. The amended STCs are effective on the date of the signed approval. Enrollment activities for the new adult population began on October 1, 2013 for the Private Option qualified health plan (QHP) with eligibility effective January 1, 2014. Contributions to a Independence Accounts (IA) for certain demonstration populations will begin in accordance with the timeframes established in the operational protocols approved by CMS. Enrollment into the demonstration will be statewide and is approved through December 31, 2016.

The STCs have been arranged into the following subject areas:

I.      Preface
II.     Program Description and Objectives
III.    General Program Requirements
IV.     Populations Affected
V.      Private Option Premium Assistance Enrollment
VI.     Premium Assistance Delivery System
VII.    Benefits
VIII.   Cost Sharing
IX.     Appeals
X.      General Reporting Requirements
XI.     General Financial Requirements
XII.    Monitoring Budget Neutrality
XIII.   Evaluation
XIV.    Monitoring
XV.     Health Information Technology and Premium Assistance

*Arkansas Health Care Independence Program*
*Approval Period: September 27, 2013 through December 31, 2016*
*Amended: January 1, 2015*                              *Page 1 of 30*

XVII. T-MSIS

## II. PROGRAM DESCRIPTION AND OBJECTIVES

Under the Private Option demonstration, the State has been providing premium assistance to support the purchase by beneficiaries eligible under the new adult group under the state plan of coverage from QHPs offered in the individual market through the Marketplace. In Arkansas, individuals eligible for coverage under the new adult group are both (1) childless adults ages 19 through 64 with incomes at or below 133 percent of the federal poverty limit (FPL) or (2) parents and other caretakers between the ages of 19 through 64 with incomes between 17 percent and 133 percent of the FPL (collectively Private Option beneficiaries). Arkansas expects approximately 200,000 beneficiaries to be enrolled into the Marketplace through this demonstration program.

With this amendment the State will test innovative approaches to newly eligible adult beneficiary cost sharing and individual financial responsibility for care. All Private Option participants with incomes between 50 percent and 133 percent of the FPL will receive an Independence Account administered by a third party administrator (TPA) for use to cover copayments and coinsurance. The State will ensure that the IA is funded beyond the individual contribution level to cover any copayment and coinsurance obligation that is not otherwise the responsibility of the individual. Notices will educate individuals about the value of participating. To provide a financial incentive to participate, individuals making at least six monthly contributions will be eligible to receive a rollover of funds to offset future QHP premium payments, the employee's contribution to employer-sponsored insurance, or Medicare premiums (for individuals over age 64), so long as the individual resides in Arkansas.

The new adult population with incomes above 100 percent FPL will make contributions of $10-$25 per month to their IA, depending on income. Individuals at this income level who fail to make contributions must pay the QHP's copayments or coinsurance at the point of service in order to receive services. If the individual restarts making contribution payments, the card will be reactivated to cover QHP-level copayments or coinsurance at the point of service.

The new adult population with incomes between 50 percent and 100 percent FPL will contribute $5 per month to their IA. Individuals at this income level who fail to make a monthly contribution will not be required to make copayments or coinsurance at the point of service, but they will be billed for Medicaid-level copayments by the TPA. If the individual fails to pay the TPA, any previously accrued rollover balances in the IAs will be used to pay the debt. Once those funds have been used, the individual will incur a debt to the State. The participants can avoid future Medicaid-level copayments by making the monthly $5 contribution to their IA.
Private Option beneficiaries will receive the State plan Alternative Benefit Plan (ABP) primarily through a QHP that they select and will have cost sharing obligations consistent with the State plan.

With this demonstration Arkansas proposes to further the objectives of Title XIX by:
- Promoting continuity of coverage for individuals,
- Improving access to providers,

*Arkansas Health Care Independence Program*
*Approval Period: September 27, 2013 through December 31, 2016*
*Amended: January 1, 2015*                                      *Page 2 of 30*

- Smoothing the "seams" across the continuum of coverage, and
- Furthering quality improvement and delivery system reform initiatives.

Arkansas proposes that the demonstration will provide integrated coverage for low-income Arkansans, leveraging the efficiencies of the private market to improve continuity, access, and quality for Private Option beneficiaries. The State proposes that the demonstration will also drive structural health care system reform and more competitive premium pricing for all individuals purchasing coverage through the Marketplace by doubling the size of the population enrolling in QHPs offered through the Marketplace.

The State proposes to demonstrate following key features:

*Continuity of coverage and care* – For households with members eligible for coverage under Title XIX and Marketplace coverage as well as those who have income fluctuations that cause their eligibility to change year-to-year, or multiple times throughout the year, the demonstration will create continuity of health plans available for selection as well as provider networks. Households may stay enrolled in the same plan regardless of whether their coverage is subsidized through Medicaid, or Advanced Payment Tax Credits/Cost Sharing Reductions (APTC/CSRs). IAs will also be established for individuals with income from 50–133 percent FPL to help smooth the transition out of the Private Option and into private market plans. For those who start at a very low income and progress to higher income levels, IAs can provide a consistent approach to the financing and receipt of health care services.

*Support equalization of provider reimbursement and improve provider access* – The demonstration will support equalization of provider reimbursement across payers, toward the end of expanding provider access and eliminating the need for providers to cross-subsidize. Arkansas Medicaid provides rates of reimbursement lower than Medicare or commercial payers, causing some providers to forego participation in the program and others to "cross subsidize" their Medicaid patients by charging more to private insurers.

*Promote accountability, personal responsibility and transparency, and encourage and reward responsible choices* – The introduction of IAs will provide participants with direct information about the cost of health care services and out-of-pocket costs. It also promotes independence and self-sufficiency by providing participants with the possibility of having additional funds to be used to pay future private market premiums. IA funds will provide stability to individuals as they move into the private market, helping to sustain them in the private market for a longer period of time and, in turn, reducing their reliance on public health care coverage programs. The demonstration also provides both positive incentives and realistic consequences related to the individual's adherence to IA program requirements.

*Integration and efficiency* – Arkansas is proposing taking an integrated and market-based approach to covering uninsured Arkansans.

## III. GENERAL PROGRAM REQUIREMENTS

1. **Compliance with Federal Non-Discrimination Statutes.** The State must comply with all

applicable federal statutes relating to non-discrimination. These include, but are not limited to, the Americans with Disabilities Act of 1990, Title VI of the Civil Rights Act of 1964, section 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975.

2. **Compliance with Medicaid and Children's Health Insurance Program (CHIP) Law, Regulation, and Policy.** All requirements of the Medicaid program and CHIP, expressed in law, regulation, and policy statement, not expressly waived or identified as not applicable in the waiver and expenditure authority documents (of which these terms and conditions are part), apply to the demonstration.

3. **Changes in Medicaid and CHIP Law, Regulation, and Policy.** The State must, within the timeframes specified in law, regulation, or policy statement, come into compliance with any changes in federal law, regulation, or policy affecting the Medicaid or CHIP program that occur during this demonstration approval period, unless the provision being changed is expressly waived or identified as not applicable. In addition, CMS reserves the right to amend the STCs to reflect such changes and/or changes without requiring the State to submit an amendment to the demonstration under STC 7. CMS will notify the State 30 days in advance of the expected approval date of the amended STCs to allow the State to provide comment.

4. **Impact on Demonstration of Changes in Federal Law, Regulation, and Policy.**

   a. To the extent that a change in federal law, regulation, or policy requires either a reduction or an increase in federal financial participation (FFP) for expenditures made under this demonstration, the State must adopt, subject to CMS approval, a modified budget neutrality agreement as well as a modified allotment neutrality worksheet for the demonstration as necessary to comply with such change. The modified budget neutrality agreement will be effective upon the implementation of the change.

   b. If mandated changes in the federal law require State legislation, the changes must take effect on the day such State legislation becomes effective, or on the last day such legislation was required to be in effect under the law.

5. **State Plan Amendments.** If the eligibility of a population eligible through the Medicaid or CHIP State plan is affected by a change to the demonstration, a conforming amendment to the appropriate State plan may be required, except as otherwise noted in these STCs. In all such instances the Medicaid State plan governs.

   a. Should the State amend the State plan to make any changes to eligibility for this population, upon submission of the State plan amendment, the State must notify CMS demonstration staff in writing of the pending State plan amendment, and request a corresponding technical correction to the demonstration.

6. **Changes Subject to the Amendment Process.** Changes related to demonstration features including eligibility, enrollment, benefits, enrollee rights, delivery systems, cost sharing, evaluation design, sources of non-federal share of funding, budget neutrality, and other

comparable program elements must be submitted to CMS as amendments to the demonstration. All amendment requests are subject to approval at the discretion of the Secretary in accordance with section 1115 of the Act. The State must not implement changes to these elements without prior approval by CMS either through an approved amendment to the Medicaid State plan and/or amendment to the demonstration. Amendments to the demonstration are not retroactive and FFP will not be available for changes to the demonstration that have not been approved through the amendment process set forth in STC 7 below.

7. **Amendment Process.** Requests to amend the demonstration must be submitted to CMS for approval no later than 120 days prior to the planned date of implementation of the change and may not be implemented until approved. CMS reserves the right to deny or delay approval of a demonstration amendment based on non-compliance with these STCs, including but not limited to failure by the State to submit required reports and other deliverables in a timely fashion according to the deadlines specified herein. Amendment requests must include, but are not limited to, the following:

   a. An explanation of the public process used by the State, consistent with the requirements of STC 15, prior to submission of the requested amendment;

   b. A data analysis worksheet which identifies the specific "with waiver" impact of the proposed amendment on the current budget neutrality agreement. Such analysis shall include current total computable "with waiver" and "without waiver" status on both a summary and detailed level through the current approval period using the most recent actual expenditures, as well as summary and detailed projections of the change in the "with waiver" expenditure total as a result of the proposed amendment, which isolates (by Eligibility Group) the impact of the amendment;

   c. An up-to-date CHIP allotment neutrality worksheet, if necessary;

   d. A detailed description of the amendment, including impact on beneficiaries, with sufficient supporting documentation; and

   e. A description of how the evaluation design will be modified to incorporate the amendment provisions.

8. **Extension of the Demonstration.** States that intend to request demonstration extensions under sections 1115(e) or 1115(f) are advised to observe the timelines contained in those statutes. Otherwise, no later than 12 months prior to the expiration date of the demonstration, the governor or chief executive officer of the State must submit to CMS either a demonstration extension request or a transition and phase-out plan consistent with the requirements of STC 9.

   a. Compliance with Transparency Requirements at 42 CFR §431.412.

   b. As part of the demonstration extension requests the State must provide documentation of

*Arkansas Health Care Independence Program*
*Approval Period: September 27, 2013 through December 31, 2016*
*Amended: January 1, 2015*                                    *Page 5 of 30*

compliance with the transparency requirements 42 CFR §431.412 and the public notice and tribal consultation requirements outlined in STC 15.

9. **Demonstration Phase Out.** The State may only suspend or terminate this demonstration in whole, or in part, consistent with the following requirements.

   a. Notification of Suspension or Termination: The State must promptly notify CMS in writing of the reason(s) for the suspension or termination, together with the effective date and a transition and phase-out plan. The State must submit its notification letter and a draft plan to CMS no less than six (6) months before the effective date of the demonstration's suspension or termination. Prior to submitting the draft plan to CMS, the State must publish on its website the draft transition and phase-out plan for a 30-day public comment period. In addition, the State must conduct tribal consultation in accordance with its approved tribal consultation State Plan Amendment. Once the 30-day public comment period has ended, the State must provide a summary of each public comment received the State's response to the comment and how the State incorporated the received comment into the revised plan.

   b. The State must obtain CMS approval of the transition and phase-out plan prior to the implementation of the phase-out activities. Implementation of activities must be no sooner than 14 days after CMS approval of the plan.

   c. Transition and Phase-out Plan Requirements: The State must include, at a minimum, in its plan the process by which it will notify affected beneficiaries, the content of said notices (including information on the beneficiary's appeal rights), the process by which the State will conduct administrative reviews of Medicaid eligibility prior to the termination of the program for the affected beneficiaries, and ensure ongoing coverage for those beneficiaries determined eligible, as well as any community outreach activities including community resources that are available.

   d. Phase-out Procedures: The State must comply with all notice requirements found in 42 CFR §431.206, §431.210, and §431.213. In addition, the State must assure all appeal and hearing rights afforded to demonstration participants as outlined in 42 CFR §431.220 and §431.221. If a demonstration participant requests a hearing before the date of action, the State must maintain benefits as required in 42 CFR §431.230. In addition, the State must conduct administrative renewals for all affected beneficiaries in order to determine if they qualify for Medicaid eligibility under a different eligibility category. 42 CFR Section 435.916.

   e. Exemption from Public Notice Procedures 42.CFR Section 431.416(g). CMS may expedite the federal and State public notice requirements in the event it determines that the objectives of title XIX and XXI would be served or under circumstances described in 42 CFR Section 431.416(g).

   f. Federal Financial Participation (FFP): If the project is terminated or any relevant waivers suspended by the State, FFP shall be limited to normal closeout costs associated with

terminating the demonstration including services and administrative costs of dis-enrolling participants.

10. **Post Award Forum.** Within six months of the demonstration's implementation, and annually thereafter, the State will afford the public with an opportunity to provide meaningful comment on the progress of the demonstration. At least 30 days prior to the date of the planned public forum, the State must publish the date, time and location of the forum in a prominent location on its website. The State can either use its Medical Care Advisory Committee, or another meeting that is open to the public and where an interested party can learn about the progress of the demonstration to meet the requirements of this STC. The State must include a summary of the comments in the quarterly report as specified in STC 46 associated with the quarter in which the forum was held. The State must also include the summary in its annual report as required in STC 48.

11. **Federal Financial Participation (FFP).** If the project is terminated or any relevant waivers suspended by the State, FFP shall be limited to normal closeout costs associated with terminating the demonstration including services and administrative costs of dis-enrolling enrollees.

12. **Expiring Demonstration Authority.** For demonstration authority that expires prior to the demonstration's expiration date, the State must submit a transition plan to CMS no later than six months prior to the applicable demonstration authority's expiration date, consistent with the following requirements:

    a. Expiration Requirements. The State must include, at a minimum, in its demonstration expiration plan the process by which it will notify affected beneficiaries, the content of said notices (including information on the beneficiary's appeal rights), the process by which the State will conduct administrative reviews of Medicaid eligibility for the affected beneficiaries, and ensure ongoing coverage for eligible individuals, as well as any community outreach activities.

    b. Expiration Procedures. The State must comply with all notice requirements found in 42 CFR Sections 431.206, 431.210 and 431.213. In addition, the State must assure all appeal and hearing rights afforded to demonstration enrollees as outlined in 42 CFR Sections 431.220 and 431.221. If a demonstration enrollee requests a hearing before the date of action, the State must maintain benefits as required in 42 CFR Section 431.230. In addition, the State must conduct administrative renewals for all affected beneficiaries in order to determine if they qualify for Medicaid eligibility under a different eligibility category as discussed in October 1, 2010, State Health Official Letter #10-008.

    c. Federal Public Notice. CMS will conduct a 30-day federal public comment period consistent with the process outlined in 42 CFR Section 431.416 in order to solicit public input on the State's demonstration expiration plan. CMS will consider comments received during the 30-day period during its review and approval of the State's demonstration expiration plan. The State must obtain CMS approval of the

demonstration expiration plan prior to the implementation of the expiration activities. Implementation of expiration activities must be no sooner than 14 days after CMS approval of the plan.

    d.  Federal Financial Participation (FFP):  FFP shall be limited to normal closeout costs associated with the expiration of the demonstration including services and administrative costs of dis-enrolling enrollees.

13. **Withdrawal of Waiver Authority.**  CMS reserves the right to amend and withdraw waivers or expenditure authorities at any time it determines that continuing the waivers or expenditure authorities would no longer be in the public interest or promote the objectives of Title XIX. CMS will promptly notify the State in writing of the determination and the reasons for the amendment and withdrawal, together with the effective date, and afford the State an opportunity to request a hearing to challenge CMS' determination prior to the effective date. If a waiver or expenditure authority is withdrawn or amended, FFP is limited to normal closeout costs associated with terminating the waiver or expenditure authority, including services and administrative costs of dis-enrolling enrollees.

14. **Adequacy of Infrastructure.**  The State must ensure the availability of adequate resources for implementation and monitoring of the demonstration, including education, outreach, and enrollment; maintaining eligibility systems; compliance with cost sharing requirements; and reporting on financial and other demonstration components.

15. **Public Notice, Tribal Consultation, and Consultation with Interested Parties.**  The State must comply with the State Notice Procedures set forth in 59 Fed. Reg. 49249 (September 27, 1994). The State must also comply with the tribal consultation requirements in section 1902(a)(73) of the Act as amended by section 5006(e) of the American Recovery and Reinvestment Act (ARRA) of 2009, the implementing regulations for the Review and Approval Process for Section 1115 demonstrations at 42 CFR Section 431.408, and the tribal consultation requirements contained in the State's approved State plan, when any program changes to the demonstration are proposed by the State.

    a.  In States with federally recognized Indian tribes consultation must be conducted in accordance with the consultation process outlined in the July 17, 2001 letter or the consultation process in the State's approved Medicaid State plan if that process is specifically applicable to consulting with tribal governments on waivers (42 CFR Section 431.408(b)(2)).

    b.  In States with federally recognized Indian tribes, Indian health programs, and/or Urban Indian organizations, the State is required to submit evidence to CMS regarding the solicitation of advice from these entities prior to submission of any demonstration proposal, amendment and/or renewal of this demonstration (42 CFR Section 431.408(b)(3)).

    c.  The State must also comply with the Public Notice Procedures set forth in 42 CFR Section 447.205 for changes in statewide methods and standards for setting payment

rates.

16. **Federal Financial Participation (FFP).** No federal matching for administrative or service expenditures for this demonstration will take effect until the effective date identified in the demonstration approval letter.

## IV. POPULATIONS AFFECTED

The State will use this demonstration to ensure coverage for Private Option eligible beneficiaries provided primarily through QHPs offered in the individual market instead of the fee-for-service delivery system that serves the traditional Medicaid population. The State will provide premium assistance to aid individuals in enrolling in coverage through QHPs in the Marketplace for Private Option beneficiaries and establish IAs to address cost sharing requirements and assist in the transition to private insurance coverage.

17. **Populations Affected by the Arkansas Health Care Independence (Private Option) Demonstration.** Except as described in STCs 18 and 19, the Arkansas Health Care Independence (Private Option) Demonstration affects the delivery of benefits, as set forth in section 1905(y)(2)(B) of the Act and codified at 42 CFR Section 433.204(a)(2), to adults aged 19 through 64 eligible under the State plan under 1902(a)(10)(A)(i)(VIII) of the Act, 42 CFR Section 435.119. Eligibility and coverage for these individuals is subject to all applicable Medicaid laws and regulations in accordance with the Medicaid State plan, except as expressly waived in this demonstration and as described in these STCs. Any Medicaid State plan amendments to this eligibility group, including the conversion to a modified adjusted gross income standard on January 1, 2014, will apply to this demonstration.

Table 1 Eligibility Groups

| Medicaid State Plan Mandatory Groups | Federal Poverty Level | Funding Stream | Expenditure and Eligibility Group Reporting |
|---|---|---|---|
| New Adult Group | This group includes both the parent and caretakers as well as the childless adults up to 133 percent of the FPL | Title XIX | MEG – 1 |

18. **Medically Frail Individuals.** Arkansas will institute a process to determine whether an individual is medically frail. The process will be described in the Alternative Benefit State plan. Medically frail individuals will be excluded from the demonstration.

*Arkansas Health Care Independence Program*
*Approval Period: September 27, 2013 through December 31, 2016*
*Amended: January 1, 2015*                                    *Page 9 of 30*

    a.  The term "medically frail" is inclusive of both individuals who meet the medically frail definition in 42 CFR 440.315(f) and individuals who have exceptional medical needs as determined through the Arkansas health care needs questionnaire.

    b.  Individuals excluded from enrolling in QHPs through the Private Option as a result of a determination of medical frailty as that term is defined above will have the option of receiving direct coverage through the state of either the same ABP offered to the new adult group or an ABP that is includes all benefits otherwise available under the approved Medicaid State plan (the standard Medicaid benefit package). Direct coverage will be provided through a fee- for-service (FFS) system.

**19. American Indian/Alaska Native Individuals.** Individuals identified as American Indian or Alaskan Native (AI/AN) are excluded from this demonstration unless an individual chooses to opt into the demonstration and access coverage pursuant to all the terms and conditions of this demonstration. AI/AN individuals who elect to participate in the demonstration will not be enrolled in IAs or issued an IA card; instead, they will be enrolled in the 100% Actuarial Value Silver Plan, regardless of income. Individuals who are AI/AN and who have not opted in to the Private Option will receive the ABP generally available to the new adult group through and operated through a FFS system. An AI/AN individual, whether receiving direct coverage or coverage through a QHP will be able to access covered benefits through Indian Health Service (IHS), Tribal or Urban Indian Organization (collectively, I/T/U) facilities funded through the IHS. Under the Indian Health Care Improvement Act (IHCIA), I/T/U facilities are entitled to payment notwithstanding network restrictions.

## V.  PRIVATE OPTION PREMIUM ASSISTANCE ENROLLMENT

**20.  Private Option.** For individuals affected by the Private Option, enrollment in a QHP will be a condition of receiving benefits.

**21.  Notices.** Private Option beneficiaries will receive a notice from Arkansas Medicaid advising them of the following:

    a.  **QHP Plan Selection.** The notice will include information regarding how Private Option beneficiaries can select a QHP and information on the State's auto-assignment process in the event that the beneficiary does not select a plan.

    b.  **Independence Accounts.** For individuals who will be enrolled in IAs, the notice will include specific information on cost sharing obligations, the requirements related to IAs, how the IAs are established, expected participant contributions into the accounts, the State and other public/private contributions into the IAs, how Private Option Enrollees use the IAs, and the incentives and penalties that apply to the IAs, including the consequences if contributions are not paid. The notice will also explain when the IAs

will become effective.

c. Access to Services until QHP Enrollment is Effective. The notice will include the Medicaid client identification number (CIN) and information on how beneficiaries can use the CIN number to access services until their QHP enrollment is effective.

d. Wrapped Benefits. The notice will also include information on how beneficiaries can use the CIN number to access wrapped benefits. The notice will include specific information regarding services that are covered directly through fee-for-service Medicaid, what phone numbers to call or websites to visit to access wrapped services, and any cost-sharing for wrapped services pursuant to STC 37

e. Appeals. The notice will also include information regarding the grievance and appeals process.

f. Exemption from the Alternative Benefit Plan. The notice will include information describing how Private Option beneficiaries who believe they may be exempt from the Private Option ABP, and individuals who are medically frail, can request a determination of whether they are exempt from this ABP.

22. **QHP Selection.** The QHP in which Private Option beneficiaries will enroll will be certified through the Arkansas Insurance Department's QHP certification process. The QHPs available for selection by the beneficiary will be determined by the Medicaid agency.

23. **Enrollment Process.** Individuals receiving coverage through the Private Option demonstration began to enroll during the initial QHP enrollment period (October 1, 2013–March 31, 2014). In accordance with the timeframes established in the approved IA Protocols, individuals will enroll through the following process:

a. Individuals will submit a joint application for insurance affordability programs—Medicaid, CHIP and Advanced Premium Tax Credits/Cost Sharing Reductions—electronically, via phone, by mail, or in-person.

b. An eligibility determination will be made either through the Marketplace or the Arkansas Eligibility & Enrollment Framework (EEF).

c. Once individuals have been determined eligible for coverage under Title XIX, they will enter the State's web-based portal. They will then have an opportunity to complete the health care needs questionnaire, to be assessed for medical frailty as defined in STC 21(a).

d. Individuals who are determined eligible to receive coverage through the Private Option will enter the State's web-based portal to shop among QHPs available to Private Option eligible individuals and to select a QHP.

e. The State's MMIS will capture their plan selection information and will transmit the 834

enrollment transactions to the QHP issuers and transmit a notice to the TPA for enrollment in an IA, if applicable.

f.  QHP issuers will issue insurance cards to Private Option enrollees.

g.  For individuals who will be enrolled in IAs, an IA will be established with the TPA and the IA card will be sent to enrollees, .

h.  The State's MMIS will pay premiums on behalf of beneficiaries directly to the QHP issuer.

i.  The TPA will pay copayments and coinsurance on behalf of beneficiaries to the provider for individuals enrolled in IAs.

j.  State MMIS premium payments will continue until the individual is determined to no longer be eligible; the individual selects an alternative plan during the next open enrollment period; the individual is determined to be medically frail and excluded from the Private Option; and will have the option of receiving either the ABP operated through FFS or the ABP that is the Medicaid State plan.

k.  For individuals who will be enrolled in IAs, the TPA will continue to pay, copayments and coinsurance until the individual is determined to no longer be eligible to participate in the IA program or the individual is determined to be medically frail. If an individual fails to make contributions to the IA, the effect on TPA payment of copayments and coinsurance on behalf of the individual depends on whether the individual has income above or below 100 percent FPL.

   •  For participants with incomes between 50 and 100 percent FPL who do not make contributions to the IA, the TPA will continue to pay QHP-level co-payments and co-insurance, but will bill the participant for Medicaid copayments. If the participant fails to pay the amount billed by the TPA, the TPA will deduct the copayment amounts from remaining IA balances. When there are not enough funds in the IA to cover the amount billed by the TPA, the participant will incur a debt to the State.

   •  For participants with incomes greater than 100 percent FPL who do not make contributions to the IA, the TPA will not pay copayments or coinsurance for services received. The participant will be required to pay QHP copayments or coinsurance to the provider at the point of service. The provider can deny services for failure to pay the copayment or coinsurance.

l.  In the event that an individual is determined eligible for coverage through the Private Option, but does not select a plan, the State will auto-assign the enrollee to one of the available QHPs in the beneficiary's county.

24.  **Auto-assignment.** For Private Option beneficiaries who do not select a QHP, the eligible individual will be assigned a QHP and Arkansas Medicaid will notify the new enrollee of

the effective date of his or her QHP enrollment. Individuals who are auto-assigned will be notified of their assignment and will be given a thirty-day period from the date of enrollment to request enrollment in another plan.

25. **Distribution of Members Auto-assigned.** In demonstration year one (DY1), Private Option auto-assignments will be distributed among QHP issuers in good standing with the Arkansas Insurance Department offering certified silver-level QHPs certified by the Arkansas Insurance Department with the aim of achieving a target minimum market share of Private Option enrollees for each QHP issuer in a rating region. Specifically, the target minimum market share for a QHP issuer offering silver QHP in a rating region will vary based on the number of competing QHP issuers as follows:

Two QHP issuers: 33 percent of Private Option enrollees in that region.

Three QHP issuers: 25 percent of Private Option enrollees in that region.

Four QHP issuers: 20 percent of Private Option enrollees in that region.

More than four QHP issuers: 10 percent of Private Option enrollees in that region.

26. **Changes to Auto-assignment Methodology.** The State will advise CMS 60 days prior to implementing a change to the auto-assignment methodology.

27. **Disenrollment.** Enrollees in the QHP Private Option may be disenrolled if they are determined to be medically frail after they were previously determined eligible.

## VI. PREMIUM ASSISTANCE DELIVERY SYSTEM

28. **Memorandum of Understanding.** The Arkansas Department of Human Services and the Arkansas Insurance Department have entered into a memorandum of understanding (MOU) with each QHP that will enroll individuals covered under the Demonstration. Areas to be addressed in the MOU include, but are not limited to:

    a. Enrollment of individuals in populations covered by the Demonstration;

    b. Payment of premiums and cost-sharing reductions;

    c. Reporting and data requirements necessary to monitor and evaluate the Private Option including those referenced in STC 71, ensuring enrollee access to EPSDT and other covered benefits through the QHP;

    d. Noticing requirements; and, Audit rights.

29. **Qualified Health Plans.** The State will use premium assistance to support the purchase of coverage for Private Option beneficiaries through Marketplace QHPs.

30. **Choice.** Each Private Option beneficiary will have the option to choose between at least two silver plans covering only Essential Health Benefits that are offered in the individual market through the Marketplace. The State will pay the full cost of QHP premiums.

   a. Private Option beneficiaries will be able to choose from at least two silver plans covering only Essential Health Benefits that are in each rating area of the State.

   b. Private Option beneficiaries will be permitted to choose among all silver plans covering only Essential Health Benefits that are offered in their geographic area, and thus all Private Option beneficiaries will have a choice of at least two qualified health plans.

   c. The State will comply with Essential Community Provider network requirements, as part of the Qualified Health Plan certification process.

   d. Private Option beneficiaries will have access to the same networks as other individuals enrolling in silver level QHPs through the individual Marketplace.

31. **Coverage Prior to Enrollment in a QHP.** The State will provide coverage through fee-for-service Medicaid from the date an individual is determined eligible for the New Adult Group until the individual's enrollment in the QHP becomes effective.

   a. For individuals who select (or are auto-assigned) to a QHP between the first and fifteenth day of a month, QHP coverage will become effective as of the first day of the month following QHP selection (or auto-assignment).

   b. For individuals who select (or are auto-assigned) to a QHP between the sixteenth and last day of a month, QHP coverage will become effective as of the first day of the second month following QHP selection (or auto-assignment).

   c. For individuals who will be enrolled in IAs, once contributions to the IA are required, Participants must make their initial contribution prior to the end of the second month after their QHP coverage becomes effective.

   - For participants with incomes between 50 and 100 percent FPL who do not make contributions to the IA by the first day of the third month of QHP coverage, the TPA will continue to pay the QHP-level co-payments and co-insurance, but will start billing the participant for Medicaid copayments or deduct the copayment amounts from remaining IA balances.

   - For participants with incomes greater than 100 percent FPL who do not make contributions to the IA by the first day of the third month of QHP coverage, the participant will be required to make QHP copayments or coinsurance at the point of service in order to receive services. The provider can deny services for failure to pay the copayment or coinsurance.

The timeline for requiring payments for those who do not contribute to their IAs is shown below:



32. **Family Planning.** If family planning services are accessed at a facility that the QHP considers to be an out-of-network provider, the State's fee-for-service Medicaid program will cover those services.

33. **NEMT.** Non-emergency medical transport services will be provided through the State's fee- for-service Medicaid program, consistent with these STCs.

## VII. BENEFITS

34. **Arkansas Health Care Independence Program (Private Option) Benefits.** Individuals affected by this demonstration will receive benefits as set forth in section 1905(y)(2)(B) of the Act and codified at 42 CFR Section 433.204(a)(2). These benefits are described in the Medicaid State plan.

35. **Alternative Benefit Plan.** The benefits provided under the State's alternative benefit plan for the new adult group are reflected in the State ABP State plan.

36. **Medicaid Wrap Benefits.** The State will provide through its fee-for-service system wrap-around benefits that are required for the ABP but not covered by qualified health plans. These benefits include non-emergency transportation and Early Periodic Screening Diagnosis and Treatment (EPSDT) services for individuals participating in the demonstration who are under age 21.

37. **Access to Wrap Around Benefits.** In addition to receiving an insurance card from the

applicable QHP issuer, Private Option beneficiaries will have a Medicaid CIN through which providers may bill Medicaid for wrap-around benefits. The notice containing the CIN will include information about which services Private Option beneficiaries may receive through fee-for-service Medicaid and how to access those services. This information will also be posted on Arkansas Department of Human Service's Medicaid website and be provided through information at the Department of Human Service's call centers and through QHP issuers.

38. **Early and Periodic Screening, Diagnosis, and Treatment (EPSDT).** The State must fulfill its responsibilities for coverage, outreach, and assistance with respect to EPSDT services that are described in the requirements of sections 1905(a)(4)(b) (services), 1902(a)(43) (administrative requirements), and 1905(r) (definitions).

39. **Access to Federally Qualified Health Centers and Rural Health Centers.** Private Option enrollees will have access to at least one QHP in each service area that contracts with at least one FQHC or RHC.

40. **Access to Non-Emergency Medical Transportation.** For individuals in the eligibility group established under Section 1902(a)(10)(A)(i)(VIII), the State will establish service limits for Non-Emergency Medical Transportation, except that medically frail individuals will not be subject to limits on Non-Emergency Medical Transportation. Individuals who are not medically frail, however, will be subject to a limit of eight (8) trip legs per year. Individuals may request additional units of non-emergency medical transportation through an extension of benefits process.

## VIII. COST SHARING

41. **Cost sharing.** Cost sharing for Private Option enrollees must be in compliance with federal requirements that are set forth in statute, regulation and policies, including exemptions from cost-sharing set forth in 42 CFR Section 447(b).

42. **Cost Sharing Parameters for the Arkansas Premium Assistance program.** With the approval of this Demonstration:

    a.  Enrollees under 50 percent of the FPL and AI/AN will have no cost sharing.

    b.  Enrollees at 50 percent of the FPL and above will have cost sharing consistent with Medicaid requirements and must include an aggregate cap of no more than 5 percent of family monthly or quarterly income.

43. **Payment Process for Payment of Cost Sharing Reduction to QHPs.** Agreements with QHP issuers may provide for advance monthly cost-sharing reduction (CSR) payments to cover the costs associated with the reduced cost sharing for Private Option beneficiaries.

Such payments will be subject to reconciliation at the conclusion of the benefit year based on actual expenditures by the QHP for cost sharing reduction. If a QHP issuer's actuary determines during the benefit year that the estimated advance CSR payments are significantly different than the CSR payments the QHP issuer will be entitled to during reconciliation, the QHP issuer may ask Arkansas' Department of Human Services to adjust the advance payments. Arkansas' reconciliation process will follow 45 CFR Section 156.430 to the extent applicable.

## IX. CONTRIBUTIONS TO ARKANSAS INDEPENDENCE ACCOUNTS

This section provides an overview of the planned framework that will be used to further define the programmatic features of the Arkansas Health Care Independence Program demonstration. All cost sharing will be in compliance with Medicaid requirements that are set forth in statute, regulation and policies, except as modified by the waivers and terms and conditions granted for this demonstration. Following the development and subsequent approval of the IA Protocols, Private Option beneficiaries enrolled in the demonstration will have responsibility to make contributions to IAs. The State may request changes to the Protocols, which must be approved by CMS, and which will be effective prospectively. Changes may be subject to an amendment to the STCs in accordance with paragraph 7, depending upon the nature of the proposed change.

44. **Arkansas Health Care Independence Program Independence Account Contributions.** Private Option beneficiaries with incomes greater than 50 percent FPL will make monthly contributions to IAs. These IAs will track and record beneficiary contributions and liabilities. Participants also have the opportunity to receive incentives for proper management of these accounts, as specified in the Protocols. A TPA will administer and manage the IAs and associated cards. There will be one statewide TPA, which will be selected in accordance with state procurement rules.

Private Option beneficiaries will make contributions and receive incentives as described below:

Table 2 Contribution Requirements

| INCOME RANGE | >50%-100% FPL | >100% -115% FPL | >115%-129% FPL | >129%-133% FPL |
|---|---|---|---|---|
| CONTRIBUTION | $5 | $10 | $17.50 | $25 |

a. The new adult population with incomes between 50 percent and 100 percent FPL will contribute $5 per month to their IA. The State will also contribute funds to ensure the account covers the individual's copayment and coinsurance obligations. Participants at this income level who make their contributions will not be billed by the TPA for copayments for services received during the month following the contribution. Participants who contribute to the IA for at least 6 non-consecutive months will also be eligible to receive a rollover of funds to offset future QHP premium payments, contributions to employer-sponsored insurance, or Medicare premiums (for individuals over

age 64), so long as the individual resides in Arkansas. Participants will accrue up to $15 in rollover funds for each month they make a timely contribution to the IA. Rollover funds will be capped at $200. Individuals who do not make a monthly contribution will be billed by the TPA for Medicaid copayment amounts incurred by the individual. If the individual fails to pay the TPA, any previously accrued balances in the IAs will be used to pay the debt. Once those funds have been exhausted, the individual will incur a debt to the State.

    b. The new adult population with incomes above 100 percent FPL through 133 percent FPL will contribute $10-$25 per month to their IA (depending on their income as outlined in Table 2 above). The State will ensure that the IAs contain enough funds to cover all copayment and coinsurance obligations. Participants will pay their QHP copayments and coinsurance obligations through the IA. After contributing to the IA for at least 6 non-consecutive months, individuals will be eligible to receive a rollover of funds to offset future QHP premium payments, contributions to employer-sponsored insurance, or Medicare premiums (for individuals over age 64), so long as the individual resides in Arkansas. Participants will accrue up to $15 in rollover funds for each month they make a timely contribution to the IA. Rollover funds will be capped at $200. Individuals who fail to make the contributions will be required to pay QHP copayments or coinsurance at the point of service in order to receive services.

**45. Private Option Beneficiary Protections.** The following beneficiary protections will be maintained.

    a. Only individuals with incomes greater than 100 percent FPL can be denied medical services for failure to pay copayments or coinsurance. Cost sharing will not exceed the maximum allowed under federal Medicaid regulation. Beneficiaries between 50 percent FPL and 100 percent FPL who fail to make monthly contributions to their IAs will be billed only for copayment amounts as specified in the State Plan Amendment to be submitted by the State.

    b. No individual may lose eligibility for Medicaid, be denied eligibility for Medicaid, or be denied enrollment in a Private Option health plan for failure to pay cost sharing liabilities.

    c. Cost sharing limitations described in 42 CFR 447.56(a) will be applied to all program participants.

    d. Copayment and coinsurance amounts will be consistent with federal requirements regarding Medicaid cost sharing and with the State's approved State Plan.

**46. Assurance of Compliance.** Within 120 days of implementation of the IAs, the State shall provide CMS a progress report that verifies the IAs are operating in accordance with the approved Protocol. Should the program be deemed out of compliance, CMS will request the State to provide a corrective action plan. Failure to correct deficiencies may result in disallowance or program suspension until all operations are compliant.

**47. Additional Incentives and Penalties.** Following CMS approval of the IA Protocols, the State may submit additional changes to the Protocols to enhance the program's incentives and consequences for program enrollees who are not complying with CMS-approved requirements.

**48. Independence Account Protocol.** The State must submit a draft IA Protocol to CMS for review and approval prior to implementing additional changes to the IA program. The state's submission must be no later than 30 days prior to the planned implementation. The initial set of Protocols will include the following items:

    a. The approach to implementation, including the approach for those whose QHP enrollment occurs on or after the effective date of the amendment and the approach to notify and enroll existing QHP enrollees.

    b. Rules to ensure that roll over IA funds may only be disbursed for the Enrollee's QHP premiums, contributions to employer-sponsored insurance, or Medicare premiums (for individuals over age 64), for individuals residing in Arkansas.

    c. The strategy and operational description of how IA debits and credits will be accurately tracked.

    d. A description, strategy and implementation plan of the beneficiary education and assistance process including copies of beneficiary notices, a description of beneficiaries' rights and responsibilities, appeal rights and processes and instructions for beneficiaries about how to interact with state officials for discrepancies or other issues that arise regarding the beneficiaries' IAs.

    e. A strategy for educating participants on how to use the statements and understand that their health care expenditures will be covered.

    f. For participants who are determined no longer eligible for the demonstration, a method for the administration of the remaining IA balances.

## X. APPEALS

Beneficiary safeguards of appeal rights will be provided by the State, including fair hearing rights. No waiver will be granted related to appeals. The State must ensure compliance with all federal and State requirements related to beneficiary appeal rights. Pursuant to the Intergovernmental Cooperation Act of 1968, the State may submit a State Plan Amendment delegating certain responsibilities to the Arkansas Insurance Department or another state agency.

## XI. GENERAL REPORTING REQUIREMENTS

    **49. General Financial Requirements.** The State must comply with all general financial requirements under Title XIX, including reporting requirements related to monitoring budget

neutrality, set forth in Section XII of these STCs.

50. **Reporting Requirements Related to Budget Neutrality.** The State must comply with all reporting requirements for monitoring budget neutrality set forth in Section XII of these STCs.

51. **Monitoring Calls.** CMS will convene periodic conference calls with the State. The purpose of these calls is to discuss any significant actual or anticipated developments affecting the demonstration; including planning for future changes in the program or intent to further implement the Private Option beyond December 31, 2016. CMS will provide updates on any amendments or concept papers under review, as well as federal policies and issues that may affect any aspect of the demonstration. The State and CMS will jointly develop the agenda for the calls.

Areas to be addressed include, but are not limited to:

1. Transition and implementation activities;
2. Stakeholder concerns;
3. QHP operations and performance;
4. Enrollment;
5. Cost sharing;
6. Independence Accounts
6. Quality of care;
7. Beneficiary access,
8. Benefit package and wrap around benefits;
9. Audits;
10. Lawsuits;
11. Financial reporting and budget neutrality issues;
12. Progress on evaluation activities and contracts;
13. Related legislative developments in the State; and
14. Any demonstration changes or amendments the State is considering.

52. **Quarterly Progress Reports.** The State will provide quarterly reports to CMS.

a. The reports shall provide sufficient information for CMS to understand implementation progress of the demonstration, including the reports documenting key operational and other challenges, underlying causes of challenges, how challenges are being addressed, as well as key achievements and to what conditions and efforts successes can be attributed.

b. Monitoring and performance metric reporting templates are subject to review and approval by CMS. Where possible, information will be provided in a structured manner that can support federal tracking and analysis.

53. **Compliance with Federal Systems Innovation.** As MACBIS or other federal systems continue to evolve and incorporate 1115 waiver reporting and analytics, the State shall work with CMS to revise the reporting templates and submission processes to accommodate timely

compliance with the requirements of the new systems.

54. **Demonstration Annual Report.** The annual report must, at a minimum, include the requirements outlined below. The State will submit the draft annual report no later than 90 days after the end of each demonstration year. Within 30 days of receipt of comments from CMS, a final annual report must be submitted for the demonstration year (DY) to CMS.

    a.   All items included in the quarterly report pursuant to STC 46 must be summarized to reflect the operation/activities throughout the DY;

    b.   Total annual expenditures for the demonstration population for each DY, with administrative costs reported separately;

    c.   Total contributions, withdrawals, balances, and rollover funds related to IAs; and

    d.   Yearly enrollment reports for demonstration enrollees for each DY (enrollees include all individuals enrolled in the demonstration) that include the member months, as required to evaluate compliance with the budget neutrality agreement;

55. **Final Report.** Within 120 days following the end of the demonstration, the State must submit a draft final report to CMS for comments. The State must take into consideration CMS' comments for incorporation into the final report. The final report is due to CMS no later than 120 days after receipt of CMS' comments.

## XII. GENERAL FINANCIAL REQUIREMENTS

This project is approved for Title XIX expenditures applicable to services rendered during the demonstration period. This section describes the general financial requirements for these expenditures.

56. **Quarterly Expenditure Reports.** The State must provide quarterly Title XIX expenditure reports using Form CMS-64, to separately report total Title XIX expenditures for services provided through this demonstration under section 1115 authority. CMS shall provide Title XIX FFP for allowable demonstration expenditures, only as long as they do not exceed the pre-defined limits on the costs incurred, as specified in section XII of the STCs.

57. **Reporting Expenditures under the Demonstration.** The following describes the reporting of expenditures subject to the budget neutrality agreement:

    a.   Tracking Expenditures. In order to track expenditures under this demonstration, the State will report demonstration expenditures through the Medicaid and State Children's Health Insurance Program Budget and Expenditure System (MBES/CBES), following routine CMS-64 reporting instructions outlined in section 2500 and Section 2115 of the SMM. All demonstration expenditures subject to the budget neutrality limit must be reported each quarter on separate forms CMS-64.9 WAIVER and/or 64.9P WAIVER, identified

by the demonstration project number assigned by CMS (including the project number extension, which indicates the DY in which services were rendered or for which capitation payments were made). For monitoring purposes, and consistent with annual CSR reconciliation, cost settlements must be recorded on the appropriate prior period adjustment schedules (forms CMS-64.9 Waiver) for the summary line 10B, in lieu of lines 9 or 10C. For any other cost settlements (i.e., those not attributable to this demonstration), the adjustments should be reported on lines 9 or 10C, as instructed in the SMM. The term, "expenditures subject to the budget neutrality limit," is defined below in STC 62.

b.  Cost Settlements. For monitoring purposes, and consistent with annual CSR reconciliation, cost settlements attributable to the demonstration must be recorded on the appropriate prior period adjustment schedules (form CMS-64.9P Waiver) for the summary sheet sine 10B, in lieu of lines 9 or 10C. For any cost settlement not attributable to this demonstration, the adjustments should be reported as otherwise instructed in the SMM.

c.  Premium and Cost Sharing Contributions. To the extent Arkansas collects premiums, premiums and other applicable cost sharing contributions from enrollees under the demonstration must be reported to CMS each quarter on Form CMS-64 summary sheet line 9.D, columns A and B. In order to assure that these collections are properly credited to the demonstration, premium and cost-sharing collections (both total computable and federal share) should also be reported separately by DY on the form CMS-64 narrative. In the calculation of expenditures subject to the budget neutrality expenditure limit, premium collections applicable to demonstration populations will be offset against expenditures. These section 1115 premium collections will be included as a manual adjustment (decrease) to the demonstration's actual expenditures on a quarterly basis.

d.  Pharmacy Rebates. Pharmacy rebates are not considered here as this program is not eligible.

e.  Use of Waiver Forms for Medicaid. For each DY, separate Forms CMS-64.9 Waiver and/or 64.9P Waiver shall be submitted reporting expenditures for individuals enrolled in the demonstration, subject to the budget neutrality limit (Section XII of these STCs). The State must complete separate waiver forms for the following eligibility groups/waiver names:

   i. MEG 1 – "New Adult Group"

f.  The first Demonstration Year (DY1) will begin on January 1, 2014. Subsequent DYs will be defined as follows:

Table 3 Demonstration Populations

*Arkansas Health Care Independence Program*
*Approval Period: September 27, 2013 through December 31, 2016*
*Amended: January 1, 2015*                                   *Page 22 of 30*

| Demonstration Year 1 (DY1) | January 1, 2014 | 12 months |
| Demonstration Year 2 (DY2) | January 1, 2015 | |
| Demonstration Year 3 (DY3) | January 1, 2016 | |

58. **Administrative Costs.** Administrative costs will not be included in the budget neutrality limit, but the State must separately track and report additional administrative costs that are directly attributable to the demonstration, using Forms CMS-64.10 Waiver and/or 64.10P Waiver, with waiver name Local Administration Costs ("ADM").

59. **Claiming Period.** All claims for expenditures subject to the budget neutrality limit (including any cost settlements) must be made within 2 years after the calendar quarter in which the State made the expenditures. Furthermore, all claims for services during the demonstration period (including any cost settlements) must be made within 2 years after the conclusion or termination of the demonstration. During the latter 2-year period, the State must continue to identify separately net expenditures related to dates of service during the operation of the section 1115 demonstration on the Form CMS-64 and Form CMS-21 in order to properly account for these expenditures in determining budget neutrality.

60. **Reporting Member Months.** The following describes the reporting of member months for demonstration populations:

   a. For the purpose of calculating the budget neutrality expenditure cap and for other purposes, the State must provide to CMS, as part of the quarterly report required under STC 46, the actual number of eligible member months for the demonstration populations defined in STC 17. The State must submit a statement accompanying the quarterly report, which certifies the accuracy of this information.

   To permit full recognition of "in-process" eligibility, reported counts of member months may be subject to revisions after the end of each quarter. Member month counts may be revised retrospectively as needed.

   b. The term "eligible member months" refers to the number of months in which persons are eligible to receive services. For example, a person who is eligible for three months contributes three eligible member months to the total. Two individuals who are eligible for two months each contribute two eligible member months to the total, for a total of four eligible member months.

61. **Standard Medicaid Funding Process.** The standard Medicaid funding process must be used during the demonstration. The State must estimate matchable demonstration expenditures (total computable and federal share) subject to the budget neutrality expenditure cap and separately report these expenditures by quarter for each federal fiscal year on the Form CMS-37 for both the Medical Assistance Payments (MAP) and State and Local Administration Costs (ADM). CMS will make federal funds available based upon the State's

estimate, as approved by CMS. Within 30 days after the end of each quarter, the State must submit the Form CMS-64 quarterly Medicaid expenditure report, showing Medicaid expenditures made in the quarter just ended. The CMS will reconcile expenditures reported on the Form CMS-64 quarterly with federal funding previously made available to the State, and include the reconciling adjustment in the finalization of the grant award to the State.

62. **Extent of FFP for the Demonstration.** Subject to CMS approval of the source(s) of the non-federal share of funding, CMS will provide FFP at the applicable federal matching rate for the demonstration as a whole as outlined below, subject to the limits described in STC 64:

    a. Administrative costs, including those associated with the administration of the demonstration.

    b. Net expenditures and prior period adjustments of the Medicaid program that are paid in accordance with the approved State plan.

    c. Medical Assistance expenditures made under section 1115 demonstration authority, including those made in conjunction with the demonstration, net of enrollment fees, cost sharing, pharmacy rebates, and all other types of third party liability or CMS payment adjustments.

63. **Sources of Non-Federal Share.** The State must certify that the matching non-federal share of funds for the demonstration is state/local monies. The State further certifies that such funds shall not be used as the match for any other federal grant or contract, except as permitted by law. All sources of non-federal funding must be compliant with section 1903(w) of the Act and applicable regulations. In addition, all sources of the non-federal share of funding are subject to CMS approval.

    a. CMS may review the sources of the non-federal share of funding for the demonstration at any time. The State agrees that all funding sources deemed unacceptable by CMS shall be addressed within the time frames set by CMS.

    b. Any amendments that impact the financial status of the program shall require the State to provide information to CMS regarding all sources of the non-federal share of funding.

    c. The State assures that all health care-related taxes comport with section 1903(w) of the Act and all other applicable federal statutory and regulatory provisions, as well as the approved Medicaid State plan.

64. **State Certification of Funding Conditions.** The State must certify that the following conditions for non-federal share of demonstration expenditures are met:

    a. Units of government, including governmentally operated health care providers, may certify that State or local tax dollars have been expended as the non-federal share of funds under the demonstration.

b. To the extent the State utilizes certified public expenditures (CPEs) as the funding mechanism for Title XIX (or under section 1115 authority) payments, CMS must approve a cost reimbursement methodology. This methodology must include a detailed explanation of the process by which the State would identify those costs eligible under Title XIX (or under section 1115 authority) for purposes of certifying public expenditures.

c. To the extent the State utilizes CPEs as the funding mechanism to claim federal match for payments under the demonstration, governmental entities to which general revenue funds are appropriated must certify to the State the amount of such tax revenue (State or local) used to satisfy demonstration expenditures. The entities that incurred the cost must also provide cost documentation to support the State's claim for federal match.

d. The State may use intergovernmental transfers to the extent that such funds are derived from State or local tax revenues and are transferred by units of government within the State. Any transfers from governmentally operated health care providers must be made in an amount not to exceed the non-federal share of Title XIX payments.

Under all circumstances, health care providers must retain 100 percent of the reimbursement amounts claimed by the State as demonstration expenditures. Moreover, no pre-arranged agreements (contractual or otherwise) may exist between the health care providers and the State and/or local government to return and/or redirect any portion of the Medicaid payments. This confirmation of Medicaid payment retention is made with the understanding that payments that are the normal operating expenses of conducting business (such as payments related to taxes— including health care provider-related taxes—fees, and business relationships with governments that are unrelated to Medicaid and in which there is no connection to Medicaid payments) are not considered returning and/or redirecting a Medicaid payment.

## XIII. MONITORING BUDGET NEUTRALITY FOR THE DEMONSTRATION

65. **Limit on Title XIX Funding.** The State shall be subject to a limit on the amount of federal Title XIX funding that the State may receive on selected Medicaid expenditures during the period of approval of the demonstration. The limit is determined by using the per capita cost method described in STC 63, and budget neutrality expenditure limits are set on a yearly basis with a cumulative budget neutrality expenditure limit for the length of the entire demonstration. The data supplied by the State to CMS to set the annual caps is subject to review and audit, and if found to be inaccurate, will result in a modified budget neutrality expenditure limit. CMS' assessment of the State's compliance with these annual limits will be done using the Schedule C report from the CMS-64.

66. **Risk.** The State will be at risk for the per capita cost (as determined by the method described below) for demonstration populations as defined in STC 63, but not at risk for the number of enrollees in the demonstration population. By providing FFP without regard to enrollment in the demonstration populations, CMS will not place the State at risk for changing economic conditions that impact enrollment levels. However, by placing the State

at risk for the per capita costs of current eligibles, CMS assures that the demonstration expenditures do not exceed the levels that would have been realized had there been no demonstration.

67. **Calculation of the Budget Neutrality Limit.** For the purpose of calculating the overall budget neutrality limit for the demonstration, separate annual budget limits will be calculated for each DY on a total computable basis, as described in STC63 below. The annual limits will then be added together to obtain a budget neutrality limit for the entire demonstration period. The federal share of this limit will represent the maximum amount of FFP that the State may receive during the demonstration period for the types of demonstration expenditures described below. The federal share will be calculated by multiplying the total computable budget neutrality limit by the Composite Federal Share, which is defined in STC 63 below.

68. **Demonstration Populations Used to Calculate the Budget Neutrality Limit.** For each DY, separate annual budget limits of demonstration service expenditures will be calculated as the product of the trended monthly per person cost times the actual number of eligible/member months as reported to CMS by the State under the guidelines set forth in STC 66. The trend rates and per capita cost estimates for each Mandatory Enrollment Group (MEG) for each year of the demonstration are listed in the table below.

Table 4 Per Capita Cost Estimate

| MEG | TREND | DY 1 PMPM | DY 2 PMPM | DY 3 PMPM |
|---|---|---|---|---|
| New Adult Group | 4.7% | $477.63 | $500.08 | $523.58 |

a. If the State's experience of the take up rate for the new adult group and other factors that affect the costs of this population indicates that the PMPM limit described above in paragraph (a) may underestimate the actual costs of medical assistance for the new adult group, the State may submit an adjustment to paragraph (a), along with detailed expenditure data to justify this, for CMS review without submitting an amendment pursuant to STC 7. Adjustments to the PMPM limit for a demonstration year must be submitted to CMS by no later than October 1 of the demonstration year for which the adjustment would take effect.

b. The budget neutrality cap is calculated by taking the PMPM cost projection for the above group in each DY, times the number of eligible member months for that group and DY, and adding the products together across DYs. The federal share of the budget neutrality cap is obtained by multiplying total computable budget neutrality cap by the federal share.

c. The State will not be allowed to obtain budget neutrality "savings" from this population.

69. **Composite Federal Share Ratio.** The Composite Federal Share is the ratio calculated by dividing the sum total of federal financial participation (FFP) received by the State on actual demonstration expenditures during the approval period, as reported through the MBES/CBES and summarized on Schedule C (with consideration of additional allowable demonstration offsets such as, but not limited to, premium collections) by total computable demonstration expenditures for the same period as reported on the same forms. Should the demonstration be terminated prior to the end of the extension approval period (see STC 8), the Composite Federal Share will be determined based on actual expenditures for the period in which the demonstration was active. For the purpose of interim monitoring of budget neutrality, a reasonable estimate of Composite Federal Share may be developed and used through the same process or through an alternative mutually agreed upon method.

70. **Future Adjustments to the Budget Neutrality Expenditure Limit.** CMS reserves the right to adjust the budget neutrality expenditure limit to be consistent with enforcement of impermissible provider payments, health care related taxes, new federal statutes, or policy interpretations implemented through letters, memoranda, or regulations with respect to the provision of services covered under the demonstration.

71. **Enforcement of Budget Neutrality.** CMS shall enforce budget neutrality over the life of the demonstration rather than on an annual basis. However, if the State's expenditures exceed the calculated cumulative budget neutrality expenditure cap by the percentage identified below for any of the demonstration years, the State must submit a corrective action plan to CMS for approval. The State will subsequently implement the approved corrective action plan.

Table 5 Cap Thresholds

| Year | Cumulative target definition | Percentage |
|------|------------------------------|------------|
| DY 1 | Cumulative budget neutrality limit plus: | 3% |
| DY 2 | Cumulative budget neutrality limit plus: | 1.5% |
| DY 3 | Cumulative budget neutrality limit plus: | 0% |

72. **Exceeding Budget Neutrality.** If at the end of the demonstration period the cumulative budget neutrality limit has been exceeded, the excess federal funds will be returned to CMS. If the demonstration is terminated prior to the end of the budget neutrality agreement, an evaluation of this provision will be based on the time elapsed through the termination date.

## XIV. EVALUATION

73. **Submission of Evaluation Design.** The State shall submit a draft evaluation design to CMS no later than 60 days after the award of the Demonstration. The evaluation design,

including the budget and adequacy of approach to meet the scale and rigor of the requirements of STC 3, is subject to CMS approval. CMS shall provide comment within 30 days of receipt from the State. The State shall provide the Final Evaluation Design within 45 days of receipt of CMS comments. If CMS finds that the Final Evaluation Design adequately accommodates its comments, then CMS will approve the Final Evaluation Design within 30 days and attach to these STCs as Attachment A.

74. **Cost-effectiveness.** While not the only purpose of the evaluation, the core purpose of the evaluation is to support a determination as to whether the preponderance of the evidence about the costs and effectiveness of the Arkansas Private Option Demonstration using premium assistance when considered in its totality demonstrates cost effectiveness taking into account both initial and longer term costs and other impacts such as improvements in service delivery and health outcomes.

   a. The evaluation will explore and explain through developed evidence the effectiveness of the demonstration for each hypothesis, including total costs in accordance with the evaluation design as approved by CMS.

   b. Included in the evaluation will be examinations using a robust set of measures of provider access and clinical quality measures under the Private Option Demonstration compared to what would have happened for a comparable population in Medicaid fee-for-service.

   c. The State will compare total costs under the Private Option Demonstration to costs of what would have happened under a traditional Medicaid expansion. This will include an evaluation of provider rates, healthcare utilization and associated costs, and administrative expenses over time.

   d. The State will compare changes in access and quality to associated changes in costs within the Private Option. To the extent possible, component contributions to changes in access and quality and their associated levels of investment in Arkansas will be determined and compared to improvement efforts undertaken in other delivery systems.

75. **Evaluation Requirements.** The State shall engage the public in the development of its evaluation design. The evaluation design shall incorporate an interim and summative evaluation and will discuss the following requirements as they pertain to each:

   a. The scientific rigor of the analysis;

   b. A discussion of the goals, objectives and specific hypotheses that are to be tested;

   c. Specific performance and outcomes measures used to evaluate the demonstration's impact;

    d. How the analysis will support a determination of cost effectiveness;

    e. Data strategy including sources of data, sampling methodology, and how data will be obtained;

    f. The unique contributions and interactions of other initiatives; and

    g. How the evaluation and reporting will develop and be maintained.

The demonstration evaluation will meet the prevailing standards of scientific and academic rigor, as appropriate and feasible for each aspect of the evaluation, including standards for the evaluation design, conduct, and interpretation and reporting of findings. The demonstration evaluation will use the best available data; use controls and adjustments for and reporting of the limitations of data and their effects on results; and discuss the generalizability of results.

The State shall acquire an independent entity to conduct the evaluation. The evaluation design shall discuss the State's process for obtaining an independent entity to conduct the evaluation, including a description of the qualifications the entity must possess, how the State will assure no conflict of interest, and a budget for evaluation activities.

76. **Evaluation Design.** The Evaluation Design shall include the following core components to be approved by CMS:

1. Research questions and hypotheses: This includes a statement of the specific research questions and testable hypotheses that address the goals of the demonstration. At a minimum, the research questions shall address the goals of improving access, reducing churning, improving quality of care thereby leading to enhanced health outcomes, and lowering costs. The research questions will have appropriate comparison groups and may be studied in a time series. The analyses of these research questions will provide the basis for a robust assessment of cost effectiveness.

The following are among the hypotheses to be considered in development of the evaluation design and will be included in the design as appropriate:

    i. Premium Assistance beneficiaries will have equal or better access to care, including primary care and specialty physician networks and services.

    ii. Premium Assistance beneficiaries will have equal or better access to preventive care services.

    iii. Premium Assistance beneficiaries will have lower non-emergent use of emergency room services.

    iv. Premium Assistance beneficiaries will have fewer gaps in insurance coverage.

     v. Premium Assistance beneficiaries will maintain continuous access to the same
       health plans, and will maintain continuous access to providers.

     vi. Premium Assistance beneficiaries, including those who become eligible for
       Exchange Marketplace coverage, will have fewer gaps in plan enrollment,
       improved continuity of care, and resultant lower administrative costs.

     vii. Premium Assistance beneficiaries will have lower rates of potentially
       preventable emergency department and hospital admissions.

     viii. Premium assistance beneficiaries will report equal or better satisfaction in the
       care provided.

     ix. Premium Assistance beneficiaries who are young adults eligible for EPSDT
       benefits will have at least as satisfactory and appropriate access to these benefits.

     x. Premium Assistance beneficiaries will have appropriate access to non-
       emergency transportation.

     xi. Premium Assistance will reduce overall premium costs in the Exchange
       Marketplace and will increase quality of care.

     xii. The cost for covering Premium Assistance beneficiaries will be comparable to
       what the costs would have been for covering the same expansion group in
       Arkansas Medicaid fee-for-service in accordance with STC 69 on determining cost
       effectiveness and other requirements in the evaluation design as approved by
       CMS.

a. **Study Design:** The design will consider through its research questions and analysis plan
the appropriate application of the following dimensions of access and quality:

1. Comparisons of provider networks;
2. Consumer satisfaction and other indicators of consumer experience;
3. Provider experience; and
4. Evidence of improved access and quality across the continuum of coverage and
related health outcomes.

b. The design will include a description of the quantitative and qualitative study design (e.g.,
cohort, controlled before-and-after studies, interrupted time series, case-control, etc.),
including a rationale for the design selected. The discussion will include a proposed
baseline and approach to comparison; examples to be considered as appropriate include
the definition of control and/or comparison groups or within-subjects design, use of
propensity score matching and difference in differences design to adjust for differences in
comparison populations over time. The discussion will include approach to
benchmarking, and should consider applicability of national and state standards. The
application of sensitivity analyses as appropriate shall be considered

c. **Study Population:** This includes a clear description of the populations impacted by each
hypothesis, as well as the comparison population, if applicable. The discussion may
include the sampling methodology for the selected population, as well as support that a
statistically reliable sample size is available.

d. Access, Service Delivery Improvement, Health Outcome, Satisfaction and Cost Measures: This includes identification, for each hypothesis, of quantitative and/or qualitative process and/or outcome measures that adequately assess the effectiveness of the Demonstration. Nationally recognized measures may be used where appropriate. Measures will be clearly stated and described, with the numerator and dominator clearly defined. To the extent possible, the State may incorporate comparisons to national data and/or measure sets. A broad set of performance metrics may be selected from nationally recognized metrics, for example from sets developed by the Center for Medicare and Medicaid Innovation, for meaningful use under HIT, and from the Medicaid Core Adult sets. Among considerations in selecting the metrics shall be opportunities identified by the State for improving quality of care and health outcomes, and controlling cost of care.

e. Data Collection: This discussion shall include:

  1. A description of the data sources; the frequency and timing of data collection; and the method of data collection. The following shall be considered and included as appropriate:
       i.  Medicaid encounters and claims data,
       ii. Enrollment data, and
       iii. Consumer and provider surveys

f. Assurances Needed to Obtain Data: The design report will discuss the State's arrangements to assure needed data to support the evaluation design are available.

g. Data Analysis: This includes a detailed discussion of the method of data evaluation, including appropriate statistical methods that will allow for the effects of the Demonstration to be isolated from other initiatives occurring in the State. The level of analysis may be at the beneficiary, provider, and program level, as appropriate, and shall include population stratifications, for further depth. Sensitivity analyses may be used when appropriate. Qualitative analysis methods may also be described, if applicable.

h. Timeline: This includes a timeline for evaluation-related milestones, including those related to procurement of an outside contractor, if applicable, and deliverables.

i. Evaluator: This includes a discussion of the State's process for obtaining an independent entity to conduct the evaluation, including a description of the qualifications that the selected entity must possess; how the state will assure no conflict of interest, and a budget for evaluation activities.

77. **Interim Evaluation Report.** The State is required to submit a draft Interim Evaluation Report 90 days following completion of year two of the demonstration. The Interim Evaluation Report shall include the same core components as identified in STC 73 for the

Summative Evaluation Report and should be in accordance with the CMS approved evaluation design. CMS will provide comments within 60 days of receipt of the draft Interim Evaluation Report. The State shall submit the final Interim Evaluation Report within 30 days after receipt of CMS' comments.

78. **Summative Evaluation Report.** The Summative Evaluation Report will include analysis of data from Year Three of the Premium Assistance Demonstration. The State is required to submit a preliminary summative report in 180 days of the expiration of the demonstration including documentation of outstanding assessments due to data lags to complete the summative evaluation. Within 360 days of the expiration date of the Premium Assistance Demonstration, the State shall submit a draft of the final summative evaluation report to CMS. CMS will provide comments on the draft within 60 days of draft receipt. The State should respond to comments and submit the Final Summative Evaluation Report within 30 days.

79. The Final Summative Evaluation Report shall include the following core components:

    a. Executive Summary. This includes a concise summary of the goals of the Demonstration; the evaluation questions and hypotheses tested; and key findings including whether the evaluators find the demonstration to be budget neutral and cost effective, and policy implications.

    b. Demonstration Description. This includes a description of the Demonstration programmatic goals and strategies, particularly how they relate to budget neutrality and cost effectiveness.

    c. Study Design. This includes a discussion of the evaluation design employed including research questions and hypotheses; type of study design; impacted populations and stakeholders; data sources; and data collection; analysis techniques, including controls or adjustments for differences in comparison groups, controls for other interventions in the State and any sensitivity analyses, and limitations of the study.

    d. Discussion of Findings and Conclusions. This includes a summary of the key findings and outcomes, particularly a discussion of cost effectiveness, as well as implementation successes, challenges, and lessons learned.

    e. Policy Implications. This includes an interpretation of the conclusions; the impact of the Demonstration within the health delivery system in the State; the implications for State and Federal health policy; and the potential for successful Demonstration strategies to be replicated in other State Medicaid programs.

    f. Interactions with Other State Initiatives. This includes a discussion of this demonstration within an overall Medicaid context and long range planning, and includes interrelations of the demonstration with other aspects of the State's Medicaid program, and interactions

with other Medicaid waivers, the SIM award and other federal awards affecting service delivery, health outcomes and the cost of care under Medicaid.

80. **State Presentations for CMS.** The State will present to and participate in a discussion with CMS on the final design plan, post approval, in conjunction with STC 71. The State will present on its interim evaluation in conjunction with STC 72. The State will present on its summative evaluation in conjunction with STC 73.

81. **Public Access.** The State shall post the final approved Evaluation Design, Interim Evaluation Report, and Summative Evaluation Report on the State Medicaid website within 30 days of approval by CMS.

    a. For a period of 24 months following CMS approval of the Summative Evaluation Report, CMS will be notified prior to the public release or presentation of these reports and related journal articles, by the State, contractor or any other third party. Prior to release of these reports, articles and other documents, CMS will be provided a copy including press materials. CMS will be given 30 days to review and comment on journal articles before they are released. CMS may choose to decline some or all of these notifications and reviews.

82. **Electronic Submission of Reports.** The State shall submit all required plans and reports using the process stipulated by CMS, if applicable.

83. **Cooperation with Federal Evaluators.** Should CMS undertake an evaluation of the demonstration or any component of the demonstration, or an evaluation that is isolating the effects of Premium Assistance, the State shall cooperate fully with CMS and its contractors. This includes, but is not limited to, submitting any required data to CMS or the contractor in a timely manner and at no cost to CMS or the contractor.

84. **Cooperation with Federal Learning Collaboration Efforts.** The State will cooperate with improvement and learning collaboration efforts by CMS.

85. **Evaluation Budget.** A budget for the evaluation shall be provided with the evaluation design. It will include the total estimated cost, as well as a breakdown of estimated staff, administrative and other costs for all aspects of the evaluation such as any survey and measurement development, quantitative and qualitative data collection and cleaning, analyses, and reports generation. A justification of the costs may be required by CMS if the estimates provided do not appear to sufficiently cover the costs of the design or if CMS finds that the design is not sufficiently developed.

86. **Deferral for Failure to Provide Summative Evaluation Reports on Time.** The State agrees that when draft and final Interim and Summative Evaluation Reports are due, CMS may issue deferrals in the amount of $5,000,000 if they are not submitted on time to CMS or are found by CMS not to be consistent with the evaluation design as approved by CMS.

## XV. MONITORING

**87. Evaluation Monitoring Protocol.** The State shall submit for CMS approval a draft monitoring protocol no later than 60 days after the award of the Demonstration. The protocol is subject to CMS approval. CMS shall provide comment within 30 days of receipt from the State. The State shall provide the final protocol within 30 days of receipt of CMS comments. If CMS finds that the final protocol adequately accommodates its comments, then CMS will approve the final protocol within 30 days.

    a. The monitoring protocol, including metrics and network characteristics shall align with the CMS approved evaluation design.

    b. The State shall make the necessary arrangements to assure that the data needed from the health plans to which premium assistance will apply, and data needed from other sources, are available as required by the CMS approved monitoring protocol.

    c. The monitoring protocol and reports shall be posted on the State Medicaid website within 30 days of CMS approval.

**88. Quarterly Evaluation Operations Report.** The State will provide quarterly reports to CMS.

    a. The reports shall provide sufficient information for CMS to understand implementation progress of the demonstration and whether there has been progress toward the goals of the demonstration, including the reports will document key operational and other challenges, to what they attribute the challenges and how the challenges are being addressed, as well as key achievements and to what conditions and efforts they attribute the successes.

**89. Annual Discussion with CMS.** In addition to regular monitoring calls, the State shall on an annual basis present to and participate in a discussion with CMS on implementation progress of the demonstration including progress toward the goals, and key challenges, achievements and lessons learned.

**90. Rapid Cycle Assessments.** The State shall specify for CMS approval a set of performance and outcome metrics and network characteristics, including their specifications, reporting cycles, level of reporting (e.g., the State, health plan and provider level, and segmentation by population) to support rapid cycle assessment in trends under premium assistance and Medicaid fee-for-service, and for monitoring and evaluation of the demonstration.

## XVI. HEALTH INFORMATION TECHNOLOGY AND PREMIUM ASSISTANCE

91. Health Information Technology (Health IT). The State will use HIT to link services and core providers across the continuum of care to the greatest extent possible. The State is expected to achieve minimum standards in foundational areas of HIT and to develop its own goals for the transformational areas of HIT use.

   a. Health IT: Arkansas must have plans for health IT adoption for providers. This will include creating a pathway (and/or a plan) to adoption of certified EHR technology and the ability to exchange data through the State's health information exchanges. If providers do not currently have this technology, there must be a plan in place to encourage adoption, especially for those providers eligible for the Medicare and Medicaid EHR Incentive Program.

   b. The State must participate in all efforts to ensure that all regions (e.g., counties or other municipalities) have coverage by a health information exchange. Federal funding for developing HIE infrastructure may be available, per State Medicaid Director letter #11-004, to the extent that allowable costs are properly allocated among payers. The State must ensure that all new systems pathways efficiently prepare for 2014 eligibility and enrollment changes.

   c. All requirements must also align with Arkansas' State Medicaid HIT Plan and other planning efforts such as the ONC HIE Operational Plan.

## XVII. T-MSIS REQUIREMENTS

On August 23, 2013, a State Medicaid Director Letter entitled, "Transformed Medicaid Statistical Information System (T-MSIS) Data", was released. It states that all States are expected to demonstrate operational readiness to submit T-MSIS files, transition to T-MSIS, and submit timely T-MSIS data by July 1, 2014. Among other purposes, these data can support monitoring and evaluation of the Medicaid program in Arkansas against which the premium assistance demonstration will be compared.

Should the MMIS fail to maintain and produce all federally required program management data and information, including the required T-MSIS, eligibility, provider, and managed care encounter data, in accordance with requirements in the State Medicaid Manual Part 11, FFP may be suspended or disallowed as provided for in federal regulations at 42 CFR 433 Subpart C, and 45 CFR Part 95.

CENTERS FOR MEDICARE AND MEDICAID SERVICES
EXPENDITURE AUTHORITY

**NUMBER:**    11-W-00287/6

**TITLE:**    Arkansas Health Care Independence Program (Private Option)
Section 1115 Demonstration

**AWARDEE:**    Arkansas Department of Human Services

Under the authority of section 1115(a)(2) of the Social Security Act (the Act), expenditures made by the state for the items identified below, which are not otherwise included as expenditures under section 1903 shall, for the period of this demonstration extension be regarded as expenditures under the state's Title XIX plan but are further limited by the Special Terms and Conditions (STCs) for the Arkansas Health Care Independence Program (Private Option) Section 1115 demonstration.

**1. Premium Assistance, Cost Sharing Reduction Payments, and Contributions made to Independence Accounts.**  Expenditures for (1) part or all of the cost of private insurance premiums; (2) for payments and contributions to reduce cost sharing, whether directly to Qualified Health Plans or to IAs; and (3) contributions to IAs to be used as rollover funds to offset costs of commercial coverage or Medicare once an individual leaves the Private Option for certain individuals eligible under the approved state plan new adult group described in section 1902(a)(10)(A)(i)(XVIII).

Requirements Not Applicable to the Expenditure Authority:

    1.   Cost Effectiveness                                 Section 1902(a)(4)
                                                                 42 CFR 435.1015(a)(4)

        To the extent necessary to permit the state to offer premium assistance and cost sharing reduction payments that are determined to be cost effective using state developed tests of cost effectiveness that differ from otherwise permissible tests for cost effectiveness.

*Arkansas Health Care Independence Program ("Private Option")*
*Approval Period: September 27, 2013 through December 31, 2016*

*Page 1 of 1*

# CENTERS FOR MEDICARE & MEDICAID SERVICES

## WAIVER LIST

**NUMBER:**      11-W-00287/6

**TITLE:**      Arkansas Health Care Independence Program (Private Option)
Section 1115 Demonstration

**AWARDEE:**      **Arkansas Department of Human Services**

All requirements of the Medicaid program expressed in law, regulation, and policy statement, not expressly waived or identified as not applicable in accompanying expenditure authorities, shall apply to the demonstration project effective from September 27, 2013 through December 31, 2016. In addition, these waivers may only be implemented consistent with the approved Special Terms and Conditions (STCs).

Under the authority of section 1115(a)(1) of the Social Security Act (the Act), the following waivers of state plan requirements contained in section 1902 of the Act are granted subject to the STCs.

1. **Freedom of Choice**                Section 1902(a)(23)(A)

   To the extent necessary to enable Arkansas to limit beneficiaries' freedom of choice among providers to the providers participating in the network of the Private Option beneficiary's Qualified Health Plan.

2. **Payment to Providers**              Section 1902(a)(13)
                                         Section 1902(a)(30)

   To the extent necessary to permit Arkansas to provide for payment to providers equal to the market-based rates determined by the Qualified Health Plan providing primary coverage for services under the Private Option.

3. **Prior Authorization**              Section 1902(a)(54) insofar as it
                                         incorporates Section 1927(d)(5)

   To permit Arkansas to require that requests for prior authorization for drugs be addressed within 72 hours, rather than 24 hours as is currently required in their state policy. A 72-hour supply of the requested medication will be provided in the event of an emergency.

| 4. Independence Account Contributions | Section 1902(a)(14) insofar as it incorporates Sections 1916 and 1916A |

To the extent necessary to enable the State to collect monthly contributions for individuals with incomes between 50 and 133 percent of the Federal Poverty Level (FPL).

| 5. Comparability | 1902(a)(10)(B) |

To the extent necessary to enable the State to offer additional benefits in the form of payments to Independence Accounts to a portion of the demonstration-eligible population enrolled in a Private Option plans.

To the extent necessary to enable the State to impose targeted cost sharing on individuals in the eligibility group found at Section 1902(a)(10)(A)(i)(VIII) with incomes greater than 50% of the federal poverty level.

To the extent necessary to enable the State to impose different amounts of cost-sharing on individuals in the eligibility group found at Section 1902(a)(10)(A)(i)(VIII) who are Private Option Enrollees than on individuals who are served through fee-for-service Medicaid.

To the extent necessary to enable the State to limit access to non-emergency medical transportation for non-medically frail individuals in the eligibility group found at Section 1902(a)(10)(A)(i)(VIII).

202815829.1

Summary of Comments and Responses on Proposed Amendment to
Arkansas 1115 Waiver

**General Comments**

**Comment 1:** One commenter expressed concern that the changes to Arkansas's 1115 waiver would create unfunded liabilities for the state and requested that the State estimate the scope of the unfunded liabilities.

**Answer 1:** The State recognizes that the programmatic changes could have budgetary implications in the future. As part of the initial approval process for the Demonstration, Arkansas estimated the annual expenditures under the Private Option and released these numbers to the public. The State will revise these estimates to account for programmatic changes proposed in the amendment. The State will ensure that there is sufficient funding available for the program.

**Independence Accounts**

**Comment 2:** One commenter stated that the proposed Independence Account program seemed complicated and questioned why the state legislature would require such a program.

**Answer 2:** The State acknowledges that the Independence Account program is somewhat complex, but is designed to promote beneficiary accountability while complying with federal Medicaid law. The State will develop notices and educational materials to ensure that beneficiaries understand how the Independence Accounts operate.

**Comment 3:** One commenter opposed the State's plan to require that individuals with incomes above 100% FPL who fail to make monthly contributions pay co-payments or co-insurance at the point of service. The commenter stated that the QHP cost-sharing could exceed Medicaid levels and that individuals may be deterred from seeking care.

**Answer 3:** Currently, individuals with incomes above 100% FPL pay co-payments and co-insurance at the point of service, and those co-payments and co-insurance amounts are consistent with federal Medicaid law. The Independence Account program does not increase beneficiaries' exposure to cost-sharing. Instead, the monthly contributions to the Independence Accounts increases the predictability of beneficiaries' health care expenditures. Any co-payments or co-insurance that beneficiaries with incomes above 100% FPL must pay at the point of service will be consistent with federal Medicaid requirements as they are today.

**Comment 4:** One commenter asked how the deductible will be handled using the Independence Accounts and whether the QHP issuers will need to make administrative changes.

**Answer 4:** Based on the points raised by this commenter, the State will not shift coverage for the deductible into the Independence Accounts. The deductible will handled year 2 of the

2

Demonstration in the same way as in year 1. QHP issuers will not need to make administrative changes.

**Comment 5:** One commenter suggested that the State develop a provider education plan to ensure that providers are aware of how Independence Accounts operate.

**Answer 5:** The State will develop provider education materials and will work closely with QHP issuers to ensure that these materials are disseminated to providers participating in the issuers' networks.

**Comment 6:** One commenter suggested that the State align the implementation of the Independence Accounts with the beginning of the new plan year on January 1, 2015. This commenter also suggested that the mailing of materials related to the Independence Accounts be coordinated with the QHP issuers.

**Answer 6:** The State intends to implement the Independence Accounts on January 1, 2015, to the extent feasible. The State will also work with QHP carriers to coordinate the mailing of any materials to the extent feasible.

**Comment 7:** One commenter stated that individuals do not generally pay co-insurance at the point of service and questioned how the providers will bill for co-insurance at the point of service. The commenter also asked how the TPA would distinguish between payments due under co-payments or co-insurance.

**Answer 7:** By "at the point of service" the State meant that the individual would make a payment to the provider in the normal course. For co-payments, that may mean that an individual makes a payment before leaving the doctor's office. For co-insurance, the beneficiaries may use the Independence Accounts to cover any co-insurance billed by the QHP issuer or provider.

**Comment 8:** One commenter asked whether the Independence Accounts may be used to cover costs associated with out-of-network providers.

**Answer 8:** No, the State does not intend to permit individuals to use their Independence Accounts to cover costs of services rendered by out-of-network providers.

**Comment 9:** One commenter asked whether the State will require that QHP issuers provide contact information for the TPA or any other information about the Independence Accounts.

**Answer 9:** The State will work closely with issuers regarding any requirements related to the Independence Accounts, including any requirements related to communications.

**Comment 10:** One commenter asked how the issuers will handle refunds related to coordination of benefit recoveries.

3

**Answer 10:** The State will work closely with issuers, beneficiaries, and the TPA to create a process to address recoveries.

**Non-Emergency Medical Transportation**

**Comment 11:** One commenter expressed concern about limiting the scope of non-emergency medical transportation (NEMT). Specifically, the commenter noted that requiring that beneficiaries who are not medically frail to request approval if they need more than eight trip legs per year could cause beneficiaries to forgo medical treatment. The commenter also noted that the State has not yet released details on how individuals may request additional trip legs.

**Answer 11:** The State is developing the process for beneficiaries to request additional trip legs, and the State will announce additional details once the process has been finalized. The State intends to use the authorization process to ensure that NEMT services are used appropriately, not with the specific goal of reducing NEMT by a specific amount.

**Comment 12:** A commenter speculated that limitations on NEMT would increase emergency room use and asked whether the Independence Accounts would reimburse for emergency room services after an individual had reached the limit on NEMT.

**Answer 12:** The State is not placing a strict limitation on NEMT; instead, it will implement an authorization process to evaluate requests for additional units of NEMT on a case-by-case basis. The Independence Accounts will not be used to reimburse for emergency room utilization.

**Other**

**Comment 13:** One commenter suggested that the State modify its auto-assignment methodology to auto-assign individuals only to the two lowest-cost plans in a given area.

**Answer 13:** The State intends to retain its current approach to auto-assignment, but it will revisit the auto-assignment methodology for 2016.

4

**Appendix: Public Notice**

*The Arkansas Department of Human Services (DHS), Division of Medical Services (DMS) is providing public notice of its intent to submit to the Centers of Medicare and Medicaid Services (CMS) a written request to amend the Health Care Independence 1115 Demonstration waiver and to hold public hearings to receive comments on the amendments to the Demonstration.*

The State will request amendments to the Health Care Independence 1115 Demonstration waiver to implement the following: (1) Independence Accounts for individuals with incomes above 50% of the federal poverty level (FPL), (2) cost-sharing for individuals with incomes from 50-100% FPL, and (3) changes to the State's non-emergency medical transportation (NEMT) benefit for individuals participating in the Demonstration.

Individuals receiving coverage through the Health Care Independence 1115 Demonstration waiver (referred to as "Private Option enrollees ") with incomes above 50% of the FPL will be enrolled in Independence Accounts. Individuals will make contributions to the Independence Accounts of $5 - $25 per month, depending on income. These individuals will use their Independence Account to pay their deductible, co-payments, and co-insurance for health care services, up to the out-of-pocket maximum. Individuals who make at least six timely monthly contributions will be eligible to receive $15 in rollover funds for each month in which they make a timely contribution. Individuals may use the rollover funds to offset Qualified Health Plan (QHP) premiums or the employee contribution to employer-sponsored insurance when they transition out of the Private Option, so long as they remain Arkansas residents.

Individuals who fail to make their monthly contributions will be subject to either co-payments or co-insurance for services they receive. Private Option enrollees with incomes above 100% FPL who fail to make their monthly contributions will pay QHP-level cost-sharing at the point-of-service, like they have under the Private Option in 2014. Private Option enrollees with incomes 50-100% FPL who fail to make monthly contributions will continue to use their Independence Account cards at the point of service, but the State's vendor will bill these individuals for Medicaid level co-payments after they receive the service. Individuals who fail to pay these co-payments will accrue a debt to the State. Any rollover funds the individual has accumulated will be reduced to offset their debt, and the State may seek to collect any remaining debt from the individuals directly.

The State also intends to implement limits on non-emergency medical transportation for all individuals eligible for coverage under Section 1902(a)(10)(A)(i)(VIII) who are not medically frail. Individuals can request trips in excess of the limit through an extension of benefits process.

The State will request the following waivers to implement the changes to the Demonstration:

- § 1902(a)(14): To enable the State to collect monthly contributions for individuals with incomes between 50 and 138 percent of the Federal Poverty Level (FPL).

5

USPS.com® - USPS Tracking® Results

# USPS Tracking® Results

**FAQs ›** (http://faq.usps.com/?articleId=220900)

### Track Another Package ＋

Remove ✕

**Tracking Number:** 70170660000089730510

         **Delivered**

## Product & Tracking Information

**See Available Actions**

**Postal Product:**
Priority Mail™

**Features:**
Certified Mail Restricted Delivery
Up to $50 insurance included Restrictions
Apply ①

**See tracking for related item:** 9590940229947094332491 (/go/TrackConfirmAction?
tLabels=9590940229947094332491)

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| **July 24, 2017, 3:07 pm** | **Delivered, Left with Individual** | **LITTLE ROCK, AR 72201** |
| | ▲ | |
| | Your item was delivered to an individual at the address at 3:07 pm on July 24, 2017 in LITTLE ROCK, AR 72201. | |
| July 22, 2017, 11:38 am | Business Closed | LITTLE ROCK, AR 72201 |
| July 22, 2017, 8:04 am | Out for Delivery | LITTLE ROCK, AR 72201 |
| July 22, 2017, 7:54 am | Sorting Complete | LITTLE ROCK, AR 72201 |
| July 22, 2017, 6:51 am | Arrived at Unit | LITTLE ROCK, AR 72202 |
| July 22, 2017, 5:33 am | Arrived at USPS Facility | LITTLE ROCK, AR 72202 |
| July 22, 2017, 4:37 am | Arrived at USPS Regional Facility | LITTLE ROCK AR DISTRIBUTION CENTER |
| July 21, 2017, 11:33 pm | Departed USPS Regional Facility | LITTLE ROCK AR DISTRIBUTION CENTER ANNEX |
| July 21, 2017, 11:33 pm | Arrived at USPS Regional Facility | LITTLE ROCK AR DISTRIBUTION CENTER ANNEX |
| July 21, 2017, 4:36 am | Arrived at USPS Regional Facility | LITTLE ROCK AR DISTRIBUTION CENTER |
| July 21, 2017, 12:30 am | Departed USPS Regional Facility | SHREVEPORT LA DISTRIBUTION CENTER |
| July 20, 2017, 3:13 pm | Arrived at USPS Facility | SHREVEPORT LA DISTRIBUTION CENTER |

8/17/2017                                    USPS.com® - USPS Tracking® Results

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| July 20, 2017, 2:48 am | Departed USPS Regional Facility | MEMPHIS TN DISTRIBUTION CENTER ANNEX |
| July 20, 2017, 12:39 am | Arrived at USPS Regional Facility | MEMPHIS TN DISTRIBUTION CENTER ANNEX |
| July 19, 2017, 3:15 pm | Departed Post Office | JONESBORO, AR 72401 |
| July 19, 2017, 2:48 pm | USPS in possession of item | JONESBORO, AR 72401 |

See Less ⌃

## Available Actions

| Text Updates | ⌄ |
|---|---|
| Email Updates | ⌄ |

See Less ⌃

## Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

**FAQs (http://faq.usps.com/?articleId=220900)**

**There's an easier way to track your packages.**

Why jump from page to page to track packages being sent to you? With My USPS™, you can easily track all your packages in one place. Sign up to:

- Set up automatic email and text alerts, so you'll never have to manually track a package again

- Provide delivery instructions, so your carrier knows where to leave packages

**Sign Up**

**(https://reg.usps.com/entreg/RegistrationAction_input?**

**app=UspsTools&appURL=https%3A%2F%2Ftools.usps.com%2Fgo%2FTrackConfirmAction%21input**

(https://www.usps.com/)

**HELPFUL LINKS**
Contact Us
(https://www.usps.com/help/welcome.htm)
Site Index (https://www.usps.com/globals/site-index.htm)
FAQs (http://faq.usps.com/)

**ON ABOUT.USPS.COM**
About USPS Home (http://about.usps.com/)
Newsroom (http://about.usps.com/news/welcome.htm)
USPS Service Updates (http://about.usps.com/news/service-alerts/welcome.htm)
Forms & Publications (http://about.usps.com/forms-publications/welcome.htm)
Government Services (https://www.usps.com/gov-services/gov-services.htm)
Careers (http://about.usps.com/careers/welcome.htm)

**OTHER USPS SITES**
Business Customer Gateway (https://gateway.usps.com/)
Postal Inspectors (https://postalinspectors.uspis.gov/)
Inspector General (http://www.uspsoig.gov/)
Postal Explorer (http://pe.usps.gov/)
National Postal Museum (http://www.postalmuseum.si.edu/)
Resources for Developers (https://www.usps.com/webtools/welcome.htm)

**LEGAL INFORMATION**
Privacy Policy (http://about.usps.com/who-we-are/privacy-policy/privacy-policy-highlights.htm)
Terms of Use (http://about.usps.com/termsofuse.htm)
FOIA (http://about.usps.com/who-we-are/foia/welcome.htm)
No FEAR Act EEO Data (http://about.usps.com/who-we-are/no-fear-act/welcome.htm)

Copyright © 2017 USPS. All Rights Reserved.

 (https://www.facebook.com/USPS?rf=108501355848630)    (https://twitter.com/usps)

 (http://www.pinterest.com/uspsstamps/)    (https://www.youtube.com/usps)

USPS.com® - USPS Tracking® Results

# USPS Tracking® Results

**FAQs ›** (http://faq.usps.com/?articleId=220900)

## Track Another Package ╋

Remove ✕

**Tracking Number:** 70170660000089730534

 ▶    ▶    ▶    **Delivered**

## Product & Tracking Information

See Available Actions

**Postal Product:**
Priority Mail™

**Features:**
Certified Mail Restricted Delivery
Up to $50 insurance included Restrictions
Apply ⓘ

**See tracking for related item:** 9590940229947094332477 (/go/TrackConfirmAction?
tLabels=9590940229947094332477)

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| **July 24, 2017, 3:07 pm** | **Delivered, Left with Individual** | **LITTLE ROCK, AR 72201** |
| ▲ | | |
| Your item was delivered to an individual at the address at 3:07 pm on July 24, 2017 in LITTLE ROCK, AR 72201. | | |
| July 22, 2017, 11:38 am | Business Closed | LITTLE ROCK, AR 72201 |
| July 22, 2017, 8:04 am | Out for Delivery | LITTLE ROCK, AR 72201 |
| July 22, 2017, 7:54 am | Sorting Complete | LITTLE ROCK, AR 72201 |
| July 22, 2017, 6:51 am | Arrived at Unit | LITTLE ROCK, AR 72202 |
| July 22, 2017, 5:33 am | Arrived at USPS Facility | LITTLE ROCK, AR 72202 |
| July 22, 2017, 4:37 am | Arrived at USPS Regional Facility | LITTLE ROCK AR DISTRIBUTION CENTER |
| July 21, 2017, 11:35 pm | Departed USPS Regional Facility | LITTLE ROCK AR DISTRIBUTION CENTER ANNEX |
| July 21, 2017, 11:35 pm | Arrived at USPS Regional Facility | LITTLE ROCK AR DISTRIBUTION CENTER ANNEX |
| July 21, 2017, 4:36 am | Arrived at USPS Regional Facility | LITTLE ROCK AR DISTRIBUTION CENTER |
| July 21, 2017, 12:30 am | Departed USPS Regional Facility | SHREVEPORT LA DISTRIBUTION CENTER |
| July 20, 2017, 3:13 pm | Arrived at USPS Facility | SHREVEPORT LA DISTRIBUTION CENTER |

8/17/2017                                 USPS.com® - USPS Tracking® Results

| DATE & TIME | STATUS OF ITEM | LOCATION |
|---|---|---|
| July 20, 2017, 2:48 am | Departed USPS Regional Facility | MEMPHIS TN DISTRIBUTION CENTER ANNEX |
| July 20, 2017, 12:39 am | Arrived at USPS Regional Facility | MEMPHIS TN DISTRIBUTION CENTER ANNEX |
| July 19, 2017, 3:15 pm | Departed Post Office | JONESBORO, AR 72401 |
| July 19, 2017, 2:51 pm | USPS in possession of item | JONESBORO, AR 72401 |

See Less ∧

## Available Actions

**Text Updates**                                                                              ∨

**Email Updates**                                                                             ∨

See Less ∧

## Can't find what you're looking for?

Go to our FAQs section to find answers to your tracking questions.

**FAQs (http://faq.usps.com/?articleId=220900)**

**There's an easier way to track your packages.**

Why jump from page to page to track packages being sent to you? With My USPS™, you can easily track all your packages in one place. Sign up to:

8/17/2017                                     USPS.com® - USPS Tracking® Results

- Set up automatic email and text alerts, so you'll never have to manually track a package again

- Provide delivery instructions, so your carrier knows where to leave packages

## Sign Up

### (https://reg.usps.com/entreg/RegistrationAction_input?

app=UspsTools&appURL=https%3A%2F%2Ftools.usps.com%2Fgo%2FTrackConfirmAction%21input*

(https://www.usps.com/)

| HELPFUL LINKS | ON ABOUT.USPS.COM | OTHER USPS SITES | LEGAL INFORMATION |
|---|---|---|---|
| Contact Us | About USPS Home (http://about.usps.com/) | Business Customer Gateway | Privacy Policy (http://about.usps.com/who-we- |
| (https://www.usps.com/help/welcome.htm) | Newsroom | (https://gateway.usps.com/) | are/privacy-policy/privacy-policy-highlights.htm) |
| Site Index (https://www.usps.com/globals/site- | (http://about.usps.com/news/welcome.htm) | Postal Inspectors | Terms of Use |
| index.htm) | USPS Service Updates | (https://postalinspectors.uspis.gov/) | (http://about.usps.com/termsofuse.htm) |
| FAQs (http://faq.usps.com/) | (http://about.usps.com/news/service- | Inspector General (http://www.uspsoig.gov/) | FOIA (http://about.usps.com/who-we- |
| | alerts/welcome.htm) | Postal Explorer (http://pe.usps.gov/) | are/foia/welcome.htm) |
| | Forms & Publications | National Postal Museum | No FEAR Act EEO Data |
| | (http://about.usps.com/forms- | (http://www.postalmuseum.si.edu/) | (http://about.usps.com/who-we-are/no-fear- |
| | publications/welcome.htm) | Resources for Developers | act/welcome.htm) |
| | Government Services | (https://www.usps.com/webtools/welcome.htm) | |
| | (https://www.usps.com/gov-services/gov- | | |
| | services.htm) | | |
| | Careers | | |
| | (http://about.usps.com/careers/welcome.htm) | | |

Copyright © 2017 USPS. All Rights Reserved.

 (https://www.facebook.com/USPS?rf=108501355848630)    (https://twitter.com/usps)

 (http://www.pinterest.com/uspsstamps/)    (https://www.youtube.com/usps)